No. 24-10760

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

SCOTT MCNUTT, *Plaintiff-Appellee*,

RICK MORRIS, HOBBY DISTILLERS ASSOCIATION, THOMAS O.
COWDREY III, JOHN PRINCE III,
*Plaintiffs-Appellees/Cross-Appellants*,

v.

US DEPARTMENT OF JUSTICE,
ALCOHOL AND TOBACCO TAX AND TRADE BUREAU,
a Bureau of the U.S. Department of the Treasury,
*Defendants-Appellants/Cross-Appellees.*

On Appeal from the United States District Court for the Northern
District of Texas, Fort Worth Division Case No. 4:23-cv-1221

**PLAINTIFFS- APPELLEES'/CROSS-APPELLANTS'
PRINCIPAL AND RESPONSE BRIEF**

Andrew M. Grossman
Kristin Shapiro
BAKER & HOSTETLER LLP
1050 Connecticut Ave., N.W.
Suite 1100
Washington, D.C. 20036
(202) 861-1697
agrossman@bakerlaw.com

Devin Watkins
  *Counsel of Record*
Dan Greenberg
COMPETITIVE ENTERPRISE INSTITUTE
1310 L Street NW, 7th Floor
Washington, DC 20005
(202) 331-1010
devin.watkins@cei.org

*Additional Counsel Listed on Inside Cover*

Robert Alt
THE BUCKEYE INSTITUTE
88 East Broad Street
Suite 1300
Columbus, OH 43215
(614) 224-4422
robert@buckeyeinstitute.org

*Counsel for Plaintiffs-Appellees/Cross-Appellants*

_____

# CERTIFICATE OF INTERESTED PERSONS

Counsel certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Plaintiffs-*Appellees/Cross-Appellants*:**
Hobby Distillers Association
Scott McNutt
Rick Morris
Thomas O. Cowdrey III
John Prince III

**Counsel for Plaintiffs:**
Devin Watkins
Dan Greenberg
Andrew M. Grossman
Kristin Shapiro
Robert Alt

**Counsel for Plaintiffs' Employer:**
Competitive Enterprise Institute
Baker & Hostetler LLP
The Buckeye Institute

**Defendants-*Appellants/Cross-Appellees*:**
U.S. Department of Justice
Alcohol and Tobacco Tax Trade Bureau

**Counsel for Defendants:**
Elizabeth Murray Tulis
Sarah Jane Clark

/s/ *Devin Watkins*
Devin Watkins

**CORPORATE DISCLOSURE STATEMENT**

Plaintiff Hobby Distillers Association is a trade name of Brewhaus (America) Inc., a Texas corporation. It has no parent corporation nor does any publicly held corporation own 10% or more of its stock. All other Plaintiffs are natural persons.

**STATEMENT REGARDING ORAL ARGUMENT**

Plaintiffs respectfully request oral argument. This case concerns whether the federal or state government has the authority to ban home distilling under the Constitution. Such issues are of great importance to our system of constitutional government and to the preservation of the liberties that this system protects. Given that importance and the complex questions these issues raise about the scope of federal authority, Plaintiffs believe that oral argument would be useful to the Court in resolving this case.

## TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................vi

TABLE OF AUTHORITIES.............................................................viii

INTRODUCTION............................................................................1

JURISDICTIONAL STATEMENT .....................................................3

ISSUES PRESENTED FOR REVIEW ................................................3

STATEMENT OF THE CASE ...........................................................3

I.    Legal Background ..............................................................3

II.   Procedural History ..........................................................10

STANDARD OF REVIEW...............................................................12

SUMMARY OF ARGUMENT ...........................................................13

ARGUMENT ................................................................................15

I.    Plaintiffs Have Standing...................................................15

    A. Plaintiffs Have Standing As They Are the Objects of the Home-Distilling Ban and Are Directly Regulated by It..........................16

    B. Plaintiffs Have Standing Because the Home-Distilling Ban Precludes Them from Obtaining the Permits Necessary to Distill..........................................................................28

        1.  Ineligibility for a Distilling Permit Is an Injury in Fact .........29

        2.  Futile Gestures Are Not Required to Establish Standing.......30

        3.  TTB's Agents, Website, Regulations, and Statutes Showed that Permit Application Would Be Futile.................................33

II.   The Home-Distilling Ban Is Not A Necessary or Proper Means
       of Execution of the Power to Collect Taxes....................................37

     A. The District Court Correctly Limited Congress's Tax Power to
         Its Proper Scope ...........................................................................40

     B. The District Court Correctly Held That Prohibiting the
         Creation of a Tax Liability Cannot Be Plainly Adapted to
         Federal Tax Collection................................................................50

     C. Home Distilling Ban Fails the Means-Ends-Fit Test That Use
         of the Tax Power Requires...........................................................62

III.  The Government's Brand-New Criticisms of the Scope of the
       Remedy Are Forfeited as Not Raised Below.................................71

     CONCLUSION ......................................................................................71

# TABLE OF AUTHORITIES

## Cases

A.L.A. Schechter Poultry Corp. v. United States,
  295 U.S. 495 (1935) ................................................................. 52

*Afroyim v. Rusk*, 387 U.S. 253 (1967) ...................................... 41

*Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289 (1979) ........ 21

*Carter v. Carter Coal Co.*, 298 U.S. 238 (1936) ................................ 47, 48

*Center for Individual Freedom v. Carmouche*,
  449 F.3d 655 (5th Cir. 2006) .............................................. 27

*Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.,*
  *Tennessee*, 274 F.3d 377 (6th Cir. 2001) .............................. 30

*Desert Outdoor Advertising, Inc. v. City of Moreno Valley*,
  103 F.3d 814 (9th Cir. 1996) .............................................. 31

*Duarte ex rel. Duarte v. City of Lewisville, Tex.*,
  759 F.3d 514 (5th Cir. 2014) .............................................. 17

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) ........................ 13

*Ellison v. Connor*, 153 F.3d 247 (5th Cir. 1998) .................. 14, 30, 31, 32

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) ........................ 17

*Felsenheld v. United States*, 186 U.S. 126 (1902) .................................. 60

*Gonzales v. Raich*, 545 U.S. 1 (2005) ...................................... 63

*Gulfport Energy Corp. v. FERC*, 41 F.4th 667 (5th Cir. 2022) .............. 17

*Hill v. Washburne*, 953 F.3d 296 (5th Cir. 2020) .................................. 13

*Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*,
  452 U.S. 264 (1981) ............................................................. 69

*Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016) .......................................... 17

*Houston, E. & W.T.R. Co. v. United States*,
   234 U.S. 342 (1914) ......................................................... 52, 53

*International Brotherhood of Teamsters v. United States*,
   431 U.S. 324 (1977) ................................................................ 31

*Ivy v. Williams*, 781 F.3d 250 (5th Cir. 2015), *vacated on other grounds
   and remanded sub nom., Ivy v. Morath*, 580 U.S. 956 (2016) ............. 29

*James Everard's Breweries v. Day*, 265 U.S. 545 (1924) ........... 40, 50, 51

*Jinks v. Richland Cnty., S.C.*, 538 U.S. 456 (2003) ............................... 38

*Joint Heirs Fellowship Church v. Akin*,
   629 F. App'x 627 (5th Cir. 2015) .................................................... 14, 27

*Kinsella v. United States ex rel. Singleton,* 361 U.S. 234 (1960) ........... 41

*Kitchen v. Herbert*, 755 F.3d 1193 (10th Cir. 2014) ............................... 29

*License Tax Cases*, 72 U.S. 462 (1866) ...................................... 45, 46, 56

*Louisiana State by & through Louisiana Dep't of Wildlife & Fisheries
   v. Nat'l Oceanic & Atmospheric Admin.*,
   70 F.4th 872 (5th Cir. 2023) ................................................................ 13

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ................... 15, 17, 18

*McCulloch v. Maryland*, 17 U.S. 316 (1819) .................................. passim

*Moore v. U.S. Dep't of Agric. on Behalf of Farmers Home Admin.*,
   993 F.2d 1222 (5th Cir. 1993) ...................................................... 30, 31

*N.L.R.B. v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937) .... 51, 52, 55

*New Hampshire Lottery Comm'n v. Rosen*,
   986 F.3d 38 (1st Cir. 2021) ................................................................ 27

*NFIB v. Sebelius*, 567 U.S. 519 (2012) .......................................... passim

*Oklahoma Tax Comm'n* v. *Texas Co.*, 336 U.S. 342 (1949) .................. 43

*Peaches Entm't Corp. v. Entm't Repertoire Assocs., Inc.*,
    62 F.3d 690 (5th Cir. 1995) ........................................ 13

*Printz v. United States*, 521 U.S. 898 (1997) ........................ 37

*Sabri v. United States*, 541 U.S. 600 (2004) ........................ 51

*Shelby Cnty., Ala. v. Holder*, 570 U.S. 529 (2013) ................ 70

*Speech First, Inc. v. Fenves*,
    979 F.3d 319 (5th Cir. 2020), *as revised* (Oct. 30, 2020) ........ 26, 27

*Stilinovic v. United States*, 336 F.2d 862 (8th Cir. 1964) ........ 60

*Three Expo Events, L.L.C. v. City of Dallas,* Texas,
    907 F.3d 333 (5th Cir. 2018) ...................................... 32

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) .............. 15, 16

*United States v. Comstock*, 560 U.S. 126 (2010) .......... 50, 63, 64, 69

*United States v. Dewitt*, 76 U.S. 41 (1869) .......... 51, 53, 60, 61

*United States v. LaBerge*, 267 F. Supp. 686 (D. Md. 1967) ........ 22

*United States v. Lopez*, 514 U.S. 549 (1995) .................... 53, 54

*United States v. Morrison*, 529 U.S. 598 (2000) .......... 49, 50, 63, 69

VI Writings of James Madison (G. Hunt ed. 1906) ................ 41

*Wickard v. Filburn*, 317 U.S. 111 (1942) ...................... 52, 53

*Zimmerman v. City of Austin*, 881 F.3d 378 (5th Cir. 2018) ........ 18

**Statutes**

13 Stat. 223 (1864) ................................................ 45

14 Stat. 98 (1866) ..................................................................... 45

14 Stat. at Large, 484, Sec. 29 ............................................... 53

26 U.S.C. § 5178(a)(1)(B) .............................................. 3, 33, 36

26 U.S.C. § 5203 ........................................................................ 65

26 U.S.C. § 5203(b) ................................................................... 65

26 U.S.C. § 5601(6) ..................................................................... 4

Distilled Spirits and Distilled Spirits and Tobacco Tax Act. 15 Stat. 125 (1868) .................................................................. 4

## Other Authorities

8 The Writings of James Madison 448, letter from James Madison to Spencer Roane (Sept. 2, 1819) .......................................... 62

Amy Renee Leiker, They sold moonshine from their basement; now they're in trouble, Wichita Eagle, Dec. 7, 2016 .................... 22

Bill Lohman, Is it time to legalize homemade spirits?, Richmond Times-Dispatch, Feb. 27, 2017 ....................................................... 24

Cong. Globe, 40th Cong., 2nd Sess. 3401 (1868) ........................ 4

Deficit Reduction Act of 1984, P.L. 98-369 ............................. 59

I.R.S., Business use of your home (last accessed Jan. 18, 2024), https://web.archive.org/web/20240118021223/https://www.irsvideos.gov/Business/SBTW/Lesson4 ................................................. 68

Jacob Sullum, Reason, *Feds Take a Sudden Interest in Busting Home Distillers* (July 14, 2014), *available at* https://reason.com/2014/07/15/feds-take-a-sudden-interest-in-busting-h/ .................................................................. 23

James Madison, The Report of 1800, available at
https://founders.archives.gov/documents/Madison/01-17-02-0202 (last
visited Dec.May 810, 2024) ...................................................................51

Perry County man pleads guilty to illegally selling moonshine,
Coshocton Tribune (Coshocton, OH), Sept. 9, 2018.............................22

Press Release, U.S. Dept. of Justice, Indictment: Couple Operated
Moonshine Still in Newton (Dec. 7, 2016) , *available at*
https://www.justice.gov/usao-ks/pr/indictment-couple-operated-
moonshine-still-newton. ....................................................................23

The Federalist No. 48 (J. Madison).........................................................48

TTB, Distilled Spirits Industry (last accessed Dec. 10, 2024),
https://www.ttb.gov/regulated-commodities/beverage-alcohol/distilled-
spirits...................................................................................................34

TTB, Home Distilling (last accessed Dec. 10, 2024),
https://www.ttb.gov/regulated-commodities/beverage-alcohol/distilled-
spirits/penalties-for-illegal-distilling .................................. 24, 28, 33, 35

U.S. Small Business Administration Office of Advocacy, *Frequently
Asked Questions* 3 (Sept. 2019), https://advocacy.sba.gov/wp-
content/uploads/2019/09/Frequently-Asked-Questions-Small-
Business-2019-11.pdf ........................................................................67

Webster, American Dictionary of the English Language (1828) ...........55

**Rules**

27 C.F.R. § 19.51 .......................................................................5, 33, 37

27 C.F.R. § 19.52(a) ...................................................................5, 33, 36

Revision of Distilled Spirits Plant Regulations,
76 Fed. Reg. 9080 (2008) .......................................................................5

## INTRODUCTION

The Constitution's Framers accomplished more than just that great charter of liberty. Many of them, including George Washington, Patrick Henry, and James Madison, were also distinguished home distillers. They established a federal government of (in Madison's words) "few and defined" powers, reserving to the states the regulation of purely local matters—among them, home distilling.

The relevant constitutional language remains unchanged, but Congress's interpretation of its authority is now quite different. A federal statute prohibits distilling "in any dwelling house, in any shed, yard, or inclosure connected with any dwelling house" under threat of imprisonment, criminal fines, and property forfeiture. The government attempts to rationalize that prohibition as a "Necessary and Proper Exercise of Congress's Tax Power," based on the federal excise tax on distilled spirits. However, the prohibition only frustrates tax collections by preventing individuals from engaging in taxable activity and paying the tax. If accepted, the government's rationalization would permit Congress to ban practically any home activity—from home cooking to in-home childcare—merely by invoking similar justifications. The

Home-Distilling Ban is neither necessary nor proper for the execution of the taxing power.

The government's attack on Plaintiffs' standing also falls flat. Each individual Plaintiff has come to the brink of violating federal criminal law, preparing concrete plans to distill at home thwarted only by the prospect of criminal sanctions for taking the very next step. The government's insistence that Plaintiffs lack standing flies in the face of established precedent that challenging "[g]overnment regulations that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024). Even if the government were correct that a more specific threat was required, the government itself sent such a threat to Plaintiff Scott McNutt warning of (per its title) "Civil and Criminal Liability." The government's own website threatens home-distillers with imprisonment and forfeiture of their homes. In addition, it stands undisputed that the Home-Distilling Ban prevents Plaintiffs from obtaining the permits necessary to distill legally—which independently establishes standing.

At stake in this case is nothing less than "the liberties that derive from the diffusion of sovereign power" under federalism. *Bond v. United States*, 564 U.S. 211, 221 (2011) (quotation marks omitted). The Court should affirm the district court's judgment in favor of Plaintiffs McNutt and Home Distilling Association and reverse its judgments that the other individual Plaintiffs lack standing.

## JURISDICTIONAL STATEMENT

Plaintiffs concur with Appellants' jurisdictional statement.

## ISSUES PRESENTED FOR REVIEW

(1)    Whether the District Court properly determined that Plaintiff McNutt has standing.

(2)    Whether Cross-Appellants have standing.

(3)    Whether the home distilling ban is a valid exercise of the Necessary and Proper Clause in its execution of the taxing power.

## STATEMENT OF THE CASE

## I.    **Legal Background**

Plaintiffs challenged two statutes that prohibit home distilling, which we call the "Home-Distilling Ban." 26 U.S.C. § 5178(a)(1)(B) provides that:

> [n]o distilled spirits plants for the production of distilled spirits shall be located in any dwelling house, in any shed, yard, or inclosure connected with any dwelling house, or on board any vessel or boat, or on premises where beer or wine is made or produced, or liquors of any description are retailed, or on premises where any other business is carried on (except when authorized under subsection (b)).

And § 5601(6) provides that:

> [any] person who uses, or possesses with intent to use, any still, boiler, or other utensil for the purpose of producing distilled spirits, or aids or assists therein, or causes or procures the same to be done, in [any location proscribed by § 5178(a)(1)(B), except as authorized by § 5178(a)(1)(C)], shall be fined not more than $10,000, or imprisoned not more than 5 years, or both, for each such offense.

The Home-Distilling Ban was enacted as part of a larger measure that slashed the federal excise tax on spirits. Distilled Spirits and Distilled Spirits and Tobacco Tax Act. 15 Stat. 125 (1868). The tax cut was intended to reduce incentives for corruption of government officials, which thrived when rates were high. Cong. Globe, 40th Cong., 2nd Sess. 3401 (1868) ("[T]he only effective means, in my opinion, to thwart the frauds of that ring [of corrupt government officers] is to put the tax at a reasonable rate.") The Home-Distilling Ban, in turn, was a concession to the burgeoning temperance movement and other moral interests that opposed the rate cut. *Id.* at 3397 ("At that time it was announced the

Ways and Means would oppose any reduction and that the temperance sentiment of the country would insist upon a high tax."). The House's 280-page report supporting the legislation demonstrates that the problem was, almost exclusively, corrupt government officials evading the excise tax, not home-based distillers evading federal tax collectors. ROA.218-508.

U.S. Alcohol and Tobacco Tax and Trade Bureau ("TTB") regulations prohibit the establishment of a distilled spirits plant in "any residence, shed, yard, or enclosure connected to a residence." 27 C.F.R. § 19.52(a).  In a 2011 rulemaking, TTB also issued a regulation stating in no uncertain terms that "[a] person may not produce distilled spirits at home for personal use." 27 C.F.R. § 19.51; *see* Revision of Distilled Spirits Plant Regulations, 76 Fed. Reg. 9080 (2011). TTB also states on its website: "While individuals of legal drinking age may produce wine or beer at home for personal or family use, Federal law strictly prohibits individuals from producing distilled spirits at home." ROA.14; TTB, Home Distilling (last accessed Dec. 10, 2024),

https://www.ttb.gov/distilled-spirits/penalties-for-illegal-distilling.

Doing so "can expose you to Federal charges for serious offenses and

lead to consequences including…criminal penalties" like imprisonment. *Id.* Furthermore, "Under 26 U.S.C. 5178(a)(1)(B), a distilled spirits plant may not be located in a residence or in sheds, yards, or enclosures connected to a residence." ROA.84; *Id.* TTB's website further explains, "If you have questions regarding [distilled spirits] permits, applications, bonds, tax payments, etc., you may contact the National Revenue Center, specifying a dedicated phone number to do so: 877-882-3277. TTB, Distilled Spirits Contacts (last accessed Dec. 10, 2024), https://www.ttb.gov/regulated-commodities/beverage-alcohol/distilled-spirits/contact-information. The application for a beverage distilling permit instructs applicants to file with the TTB's National Revenue Center and provides the same contact number. ROA.202.

## II.   Factual Background

Petitioner Scott McNutt, who has earned bachelor's and master's degrees in electrical engineering, ROA.111, is a lifelong tinkerer who loves to experiment and learn. *Id.* His curiosity led him to legally distill waste crops into alcohol for fuel. *Id.* As his declaration explained: "If the prohibition on at-home distilling was overturned or otherwise made not applicable to me, I would like to distill at home for beverage purposes."

ROA.112. McNutt explained that he is "willing to pay whatever tax is needed" and "would also ensure that I follow all lawful requirements of my state and local government" before distilling. *Id*. McNutt has no intention to sell what he makes and is "not looking to distill a lot," but if he succeeds in creating better-tasting alcohol than is commercially available, then he might start such a business in the future. ROA.113.

Plaintiff Rick Morris operates Brewhaus (America), Inc., which has a permit to legally re-distill alcohol and manufacturers' stills for the distillation and re-distillation of alcohol. ROA.109-10. Morris is a certified "bourbon steward," which entails "mastering the art of tasting spirits and learning the science behind distilling and aging." *Id*. Morris explained that he does "not have a still at my residence, but I could easily bring one there if the law permitted because my business, among other activities, manufacturers stills." ROA.110. As Morris's declaration explained: "If I could legally distill Bourbon at my home, I would do so." ROA.110. He would enjoy hosting his brother and his friends, drinking the bourbon that he made, and experimenting with different recipes. ROA.110.

Plaintiff Cowdrey discussed the still in the garage of his home: if he "were allowed under the law to distill beverage alcohol, I would do so as a hobby." ROA.116. Likewise, Plaintiff Prince says "I have space on my property that I could, hypothetically, use to distill alcohol. That space is in my four-wall garage that is attached to my house." ROA.114. Prince wishes to experiment with recipes for apple pie vodka. ROA.116. Prince's declaration states: "If I were allowed under the law to distill beverage alcohol, I would do so as a hobby." *Id.* Neither Cowdrey nor Prince wants to sell the alcohol they make. ROA.115; ROA.116.

All of the individual Plaintiffs in this case are members of the Hobby Distillers Association. ROA.109. Hobby Distillers Association was founded to encourage the legalization of home distilling. *Id.* Hobby Distillers Association has over 1,300 members across the country. *Id.* As the government notes, Plaintiff Hobby Distillers Association had previously lobbied for the passage of the Craft Beverage Modernization and Tax Reform Act. ROA.173 n.7.

In 2014, Plaintiff McNutt received an unsolicited letter from TTB entitled: "Notice of Potential Civil and Criminal Liability." *Id.*; ROA.216-17. That letter, "Signed by the Director of the TTB's Trade

Investigations Division," stated that "[f]ederal law provides no exemptions for the production of distilled spirits for personal or family use" at a location other than a distilled spirits plant and threatened that "[u]nlawful production of distilled spirits is a criminal offense, punishable by a fine of up to $500,000 and/or imprisonment for not more than 5 years." *Id.*

Based on the statute—as well as TTB's website, regulations, and letter—Plaintiffs reasonably inferred that TTB would not issue them licenses to distill at home. Nonetheless, Plaintiffs wanted to see if they could get a license for home distillery—even despite the clear prohibition. On November 27, 2023, Plaintiffs contacted TTB's National Revenue Center at the official number. Counsel spoke to TTB's agent to ask how to get a license for Plaintiffs to distill at home. ROA.16-17. A recording of this call, entered into evidence, is summarized just below; that recording was undisputed by the government. ROA.516-17[1]; ROA.541.

---

[1] The actual recording was filed in mp3 form with the district court. References are to the unofficial transcript at ROA.517 introduced below (it's easier to read), but the actual non-documentary evidence is on page 3 of the Appendix to Plaintiff's Sur-reply between ROA 217-218, in accordance with district court procedure for submitting non-documentary evidence.

Plaintiffs' counsel stated, "I am an attorney representing five clients. My clients are interested in getting a permit to distill alcohol at home. . . Is that something that TTB would consider?" ROA.517. The TTB Officer responded, "They [TTB] would consider a distillery permit application, but not at a home. Not in a residence. It's illegal to distill spirits at a residence." *Id.* Plaintiffs' counsel confirmed, "So a permit request for distilling at home would not be something that TTB would consider?" *Id.* The TTB Officer responded, "They would not. It's against the law." *Id.* Plaintiffs' counsel, later in that conversation with TTB, confirmed again, "Just to summarize: you guys might consider a permit for the manufacture of fuel alcohol, but you won't consider a permit for the manufacture of beverage alcohol. Is that right?" *Id.* The TTB Officer responded: "Correct." *Id.*

## II.   Procedural History

Less than two weeks later, Plaintiffs filed this lawsuit to challenge the constitutionality of the federal statutes that prohibit the issuance of a permit to distill at home and criminalize such distilling. ROA.12.

Plaintiffs sought a preliminary injunction. ROA.76. After the parties submitted briefing on that request, the court treated the motion

for a preliminary injunction as a motion for summary judgment after securing the consent of both parties. ROA.9, 644; Docket No. 33. Plaintiffs argued that filing a permit request would be futile, given TTB's statements that such a permit would not be considered. ROA.205.

The district court rejected the government's claim that Plaintiffs failed to demonstrate their intent to engage in the proscribed conduct. ROA.580. The district court concluded: "In short, each of these plaintiffs is no more than one overt act away from criminal liability under the challenged statutes." ROA.580.

The district court also recognized that the letter Plaintiff McNutt received "certainly makes [prosecution] *credible*," and thus that McNutt and the Hobby Distillers Association had standing. ROA.581. But despite recognizing that Plaintiffs had a "very 'serious intent' to engage in proscribed conduct" and the credible threat of prosecution from the TTB letter, the court found that the other individual Plaintiffs ("Cross-Appellants") lacked standing.

On the merits, the district court found that the Commerce Clause provides no basis for banning home distilling because that ban is

unrelated to a comprehensive interstate regulatory scheme. On appeal, the government has declined to challenge this holding.

The district court also found that the Constitution's tax power provides no basis for banning home distillery. The court, relying upon *NFIB v. Sebelius* (2012), rejected the constitutionality of the home distilling ban. It recognized that "Congress cannot criminalize the conduct of a person to whom its enumerated taxing power does not yet apply." ROA.595. Yet far from facilitating collection of the distilled spirits tax, the Home-Distilling Ban "criminally prohibit[s] the simple possession of the apparatus used to produce that taxable commodity," and thus *prevents* Plaintiffs from engaging in distilling and paying the resulting tax. ROA.597.

The district court accordingly determined that the home distilling ban lacked any foundation in the Constitution's enumerated or implied powers. ROA.595-597. The government appealed.

## STANDARD OF REVIEW

This Court "review[s] whether a plaintiff has Article III standing *de novo.*" *Louisiana State by & through Louisiana Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872, 878 (5th

12

Cir. 2023). "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion." *Hill v. Washburne*, 953 F.3d 296, 303 (5th Cir. 2020) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). "The district court's findings of fact and all its determinations regarding the equitable injunction factors are reviewed for clear error." *Id.* at 303-04 (quoting *Peaches Entm't Corp. v. Entm't Repertoire Assocs., Inc.*, 62 F.3d 690, 693 (5th Cir. 1995)). "Its conclusions of law are reviewed *de novo*." *Id.*

## SUMMARY OF ARGUMENT

Plaintiffs have standing because they are directly regulated by the Home-Distilling Ban. Even if more than that were required, the district court was correct to find that Plaintiff McNutt has shown a credible threat of enforcement based on the letter he received from TTB threatening him with fines and imprisonment for "[u]nlawful production of distilled spirits." ROA.216. The other individual plaintiffs are identically situated to McNutt, as the threatened enforcement action against him, enforcement actions against others, and public

13

enforcement threats speak equally to the threat they face. *See Joint Heirs Fellowship Church v. Akin*, 629 F. App'x 627, 631 (5th Cir. 2015).

Additionally, all Plaintiffs have standing because the Home-Distilling Ban clearly precludes them from obtaining the permits necessary for them to distill at home. The statutory text, TTB's official guidance, and even the specific guidance that TTB provided to Plaintiffs make perfectly clear that TTB will not issue permits to home distillers. Even in litigation, the government has never disputed that it would be futile for Plaintiffs to seek permits to distill within their homes. Nonetheless, it insists that Plaintiffs lack standing because they have not gone through the empty gesture of applying for permits that everyone agrees are certain to be denied. That claim is contrary to the well-established principle that a plaintiff has standing to challenge an allegedly unconstitutional policy without submitting to it by filing an application when doing so, as here, "would have been futile." *Ellison v. Connor*, 153 F.3d 247, 255 (5th Cir. 1998).

The Home-Distilling Ban exceeds the taxing power under the Necessary and Proper Clause for three reasons. First, the Home-Distilling Ban is not proper, because it exceeds the scope of the taxing

power: that scope is limited to encouraging or discouraging people's choices, not directly controlling them. When a tax liability is created, it is permissible to impose additional obligations to ensure tax collection— but the federal government may not use the tax power in a manner that prohibits individuals from incurring the tax liability in the first place. Second, the Home-Distilling Ban is not necessary, because prohibiting a person from incurring a tax liability is not a plainly adapted means of collecting taxes; the ban lacks the real and substantial relationship to collecting taxes that the Constitution requires. Third, the Home-Distilling Ban is not necessary because the means-end-fit test that the government has proposed is factually and logically insupportable.

## ARGUMENT

## I.    Plaintiffs Have Standing

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). Here, the

15

government disputes only the first prong, specifically that the injury faced by Plaintiffs is actual or imminent. The government is mistaken: the Home-Distilling Ban directly prohibits the individual Plaintiffs' conduct, they all face a credible threat of enforcement based on the government's statements and actions, and the Ban precludes them from obtaining the permits necessary to distill at home.

### A. Plaintiffs Have Standing As They Are the Objects of the Home-Distilling Ban and Are Directly Regulated by It.

The government's attack on Plaintiffs' standing is toothless: there is no dispute that the individual Plaintiffs are ready, willing, and able to distill at home, and there is no dispute that they are unable to do so only because that conduct is prohibited by a federal law, the Home-Distilling Ban, backed by criminal penalties. The point of standing doctrine is to ensure, as Madison explained, that courts "decide only matters of a Judiciary Nature," which are those that involve "a real controversy with real impact on real persons." *TransUnion LLC*, 594 U.S. at 424 (quotation marks omitted). This case is as real as it gets: the Plaintiffs challenge an exertion of federal power that prohibits them from engaging in conduct in their own homes.

1.    All of the individual Plaintiffs have standing to challenge the Home-Distilling Prohibition because it directly prohibits them from acting. As the Supreme Court confirmed only a few months ago, "Government regulations that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024). That was nothing new. The court espoused the same principle in its seminal decision on Article III standing, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992) (When "the plaintiff is himself an object of the [government] action.... there is ordinarily little question that the action ... has caused him injury."). And this Court has applied that principle. *E.g., Hollis v. Lynch*, 827 F.3d 436, 442 (5th Cir. 2016) (applying *Lujan* and agreeing that "being barred from possessing a machinegun" constituted an injury in fact); *Gulfport Energy Corp. v. FERC*, 41 F.4th 667, 678 (5th Cir. 2022) (being subject to a FERC order); *Duarte ex rel. Duarte v. City of Lewisville, Tex.*, 759 F.3d 514, 518 (5th Cir. 2014).

To begin with, each of the individual Plaintiffs has the "serious intention to engage in conduct proscribed by law." *Zimmerman v. City of*

17

*Austin*, 881 F.3d 378, 389 (5th Cir. 2018). Each declared under penalty of perjury that he would distill at home. Decl. of Rick Morris ¶ 11, ROA.110 ("If I could legally distill Bourbon at my home, I would do so."); Decl. of Scott McNutt ¶ 10, ROA.112 ("If the prohibition on at-home distilling was overturned or otherwise made not applicable to me, I would like to distill at home for beverage purposes."); Prince Decl. ¶ 4-5, ROA.114 (describing the "four-wall garage that is attached to my house" as a "space on my property that I could, hypothetically, use to distill alcohol" and "If I were allowed under the law to distill beverage alcohol, I would do so as a hobby."); Cowdrey Decl. ¶, 6 ROA.116 (describing how "I own a still that is in my garage. My garage is near my house on my property." and "If I were allowed under the law to distill beverage alcohol, I would do so as a hobby.").

Second, the individual Plaintiffs' statements of intent are not mere plans to act "some day"; rather, their plans are sufficiently concrete to demonstrate an "actual or imminent" injury." *Lujan*, 504 U.S. at 564. Contrary to the government's contention (at 11–12), Plaintiff McNutt has established a serious intention to distill beverage spirits. ROA.112. He has a Bachelor of Science in Electrical Engineering

from the U.S. Coast Guard Academy, has obtained a permit to distill for fuel use, and has operated a still (permissibly for fuel purposes) on his property. ROA.111-12. He plans "to distill at home so I can tinker and experiment" with beverage spirits. ROA.113. And he is "willing to pay whatever tax is needed" and "would also ensure that I follow all lawful requirements of my state and local government." ROA.112. The government's suggestion that McNutt's declaration establishes only a "some day" intention is preposterous; indeed, it does not identify a single additional preparatory step he could take that would not expose him to legal jeopardy.

The other individual Plaintiffs also have expressed in no uncertain terms that they would distill in their own homes but for the Home-Distilling Prohibition. Rick Morris's business manufactures and sells stills suitable for home use and has a permit to re-distill alcohol. ROA.109–10. He is literally the founder and leader of a nonprofit organization, the Hobby Distillers Association, that exists to promote home distilling. ROA.109 His declaration specifically identifies not only where he plans to distill (in the yard of his residence) but also what he plans to distill (Bourbon). ROA.110. John Prince specifically identified

where in his home he plans to distill ("in my four-wall garage that is attached to my house"), indicated that he had previously distilled alcohol, and identified the beverage spirits he intends to distill, including applejack and sour mash whiskey. ROA.114. And Thomas Cowdrey explained how he had learned to distill, testified that he currently owns a still that is located in his garage, and identified the beverage spirits he intends to distill, including one, "apple pie vodka," for which he created a recipe. ROA.116.

There is also no merit to the government's claim (at 11), raised for the first time on appeal, that Plaintiff McNutt may actually be planning to distill spirits somewhere other than in his home. Plaintiff McNutt's declaration states: "I would like to distill *at home* for beverage purposes." ROA.112 (emphasis added). "Home" means home, and that is what Plaintiff McNutt meant—he did, after all, undertake federal litigation to secure his right to distill in his home. The reason why is that he plans to iteratively improve his craft and make "better-tasting" beverages, and to do so he "need[s] to be able to distill at home" facilitate the necessary "tinker[ing] and "experiment[ing]." ROA.113. If the government seriously believed that by "at home," Plaintiff McNutt

meant somewhere other than in his home, it could have sought discovery on that issue and attempted to controvert the Plaintiffs' showing, but it did not.

The circumstances of this case illustrate how and why a plaintiff's concrete intention to undertake conduct that is clearly proscribed by law and subject to severe penalties is sufficient to establish a credible threat of enforcement and establish injury in fact. Plaintiffs here have done everything that they reasonably can do up to the point of violating the law and risking criminal penalty. If that were not sufficient, no plaintiffs could ever bring pre-enforcement challenges to laws that actively impinge the plaintiffs' rights by prohibiting their conduct.

2.    To the extent that more is needed to demonstrate a credible threat of enforcement, Plaintiffs have supplied it, both as to Plaintiff McNutt and the other individual Plaintiffs. It cannot seriously be contended that the threat faced by Plaintiffs is "imaginary or wholly speculative," and so for that reason they are "entitled to challenge [the] statute" without first exposing themselves "to actual arrest or prosecution." *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 302 (1979) (quotation marks omitted). This is not a high bar to clear. It

is enough that a plaintiff have "an intention" to engage in activities that violate a statute and that the government "has not disavowed" enforcement. *Id.* at 301–02.

As the district court found, "the threat of prosecution for [Plaintiffs' intended] conduct is credible." ROA.581. The court found standing for Plaintiff McNutt because he "received an unsolicited letter from Defendant TTB entitled: 'Notice of Potential Civil and Criminal Liability.'" *Id.* That letter was "Signed by the Director of the TTB's Trade Investigations Division" and threatened that "[u]nlawful production of distilled spirits is a criminal offense, punishable by a fine of up to $500,000 and/or imprisonment for not more than 5 years." *Id.*

This threat of prosecution was especially credible, because the government prosecutes people for the crime of distilling at home. It has done so in the past. *See, e.g., United States v. LaBerge*, 267 F. Supp. 686, 691 (D. Md. 1967). And it continues to do so today. *See, e.g.*, Perry County man pleads guilty to illegally selling moonshine, Coshocton Tribune (Coshocton, OH), Sept. 9, 2018, p. A3; Amy Renee Leiker, They sold moonshine from their basement; now they're in trouble, Wichita Eagle, Dec. 7, 2016 ("A Newton couple is facing federal charges for

making and selling moonshine out of their basement."); Press Release, U.S. Dept. of Justice, Indictment: Couple Operated Moonshine Still in Newton (Dec. 7, 2016).[2]

TTB takes pain to make prospective home-distillers aware of that fact and the threat they face. It sent letters to 8,136 "individuals who had purchased stills" threatening "legal consequences associated with the illegal production of distilled spirits," including though the "unlicensed possession" of stills and "unlawful production" of spirits. ROA.537; see Jacob Sullum, Reason, *Feds Take a Sudden Interest in Busting Home Distillers* (July 14, 2014), *available at* https://reason.com/2014/07/15/feds-take-a-sudden-interest-in-busting-h/. Attached to that letter was a press release titled "TTB and Florida Authorities Conduct Joint Moonshine Operation." ROA.217. It began: "This week, Alcohol and Tobacco Tax and Trade Bureau (TTB) investigators conducted a joint operation with special agents from the Florida Division of Alcoholic Beverages and Tobacco targeting illegal possession of stills and illegal production of distilled spirits." *Id.* The

---

[2] Available at https://www.justice.gov/usao-ks/pr/indictment-couple-operated-moonshine-still-newton.

joint operation led to the arrest of 8 distillers and the seizure of 46 stills. ROA.538; *see also* Bill Lohman, Is it time to legalize homemade spirits?, Richmond Times-Dispatch, Feb. 27, 2017 (reporting that agents made "arrests and confiscating dozens of home stills").

The letter, press release, and enforcement activities reported in the press release are not, of course, the only indication that home-distillers face a credible threat of enforcement. The TTB's official public webpage on "Home Distilling" states that violating the Home-Distilling Ban "can expose you to Federal charges for serious offenses and lead to consequences including, but not necessarily limited to" criminal fines and imprisonment and that the "tract of land on which [a] still is located"—i.e., the site of one's home—"shall be forfeited to the United States." TTB, Home Distilling (last accessed Dec. 10, 2024), [https://www.ttb.gov/regulated-commodities/beverage-alcohol/distilled-spirits/penalties-for-illegal-distilling](https://www.ttb.gov/regulated-commodities/beverage-alcohol/distilled-spirits/penalties-for-illegal-distilling). And then there is the guidance provided by TTB directly to Plaintiffs that distilling in their homes would be "illegal." ROA.517.

The government does not even attempt to explain how its public webpage threatening home-distillers with imprisonment and forfeiture

of their homes does not establish a credible threat of enforcement. It also ignores the press release describing enforcement activities. As for the letter to Plaintiff McNutt, the government attempts to minimize it as "generic" and notes that Plaintiff McNutt was not, in fact, prosecuted "in connection with the letter." Govt. Br. 12–13. The government identifies no authority for its apparent position that, to bring a pre-enforcement challenge, a plaintiff needs a personally engraved invitation by the government stating that his arrest is imminent.

Based on the government's constant refrain that home-distillers face the threat of enforcement and serious penalties, the district court was correct to conclude that Plaintiff McNutt suffers an injury in fact. It erred, however, in failing to appreciate that the same showing applies equally to the other individual Plaintiffs.

The district court's rationale was that, because "only Plaintiff McNutt received such a notice," only he faced "a credible threat of prosecution." ROA.582. But that rests on the mistaken notion that a personalized threat is required, such that the government may evade challenge by broadcasting its threats to the largest possible audience. Here, the government made—and continues to make—its position

crystal clear that a person who violates the Home-Distilling Ban will be severely punished for it. That is what the TTB announces to the public on its "Home Distilling" website," and that is what it told thousands of suspected home-distillers in its recent letter campaign. And even if some measure of personalization were required, Plaintiffs here have it: when they asked TTB about their intended conduct, the TTB told them it was "illegal." ROA.517.

In any event, the Cross-Appellants are identically situated to Plaintiff McNutt and do not have to wait to receive their own personalized threat letters from TTB. For a facial challenge, such as the ones Plaintiffs bring, if the statute is actively enforced by the government against the kind of conduct at issue, the identity of the recipient of the enforcement threat is not relevant. *See Speech First, Inc. v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020), *as revised* (Oct. 30, 2020)).

"Credible threats obviously include situations in which the statute has already been enforced against a plaintiff"; furthermore, this Court has also "held that a credible threat of enforcement also exists when an agency issued an advisory opinion on the relevant statute's meaning,

intended enforcement, and recently enforced the statute against another party." *Joint Heirs Fellowship Church*, 629 F. App'x at 631 (citing *Center for Individual Freedom v. Carmouche*, 449 F.3d 655, 660–61 (5th Cir. 2006)). A "history of past enforcement against the same conduct supports a finding of injury in fact for pre-enforcement standing." *New Hampshire Lottery Comm'n v. Rosen*, 986 F.3d 38, 50 (1st Cir. 2021).

The district court's dismissal of Cross-Appellants was erroneous. Plaintiffs brought a facial challenge to these statutes, claiming that they are beyond the enumerated powers of Congress to enact. A facial challenge does not require "some evidence that [a] rule would be applied to the plaintiff." *Fenves*, 979 F.3d at 335.

The lower court should have found that the threat of enforcement sent to Plaintiff-Appellee McNutt provided standing to all other Plaintiffs. Even the enforcement actions described in the TTB's press release should have been enough to provide every Plaintiff standing. Appellant TTB's website states that "Federal law strictly prohibits individuals from producing distilled spirits at home"; its listing of the fines and prison time associated with such activities presents threats of

enforcement that would give all Plaintiffs standing. TTB, Home
Distilling (last accessed Dec. 10, 2024), https://www.ttb.gov/regulated-
commodities/beverage-alcohol/distilled-spirits/penalties-for-illegal-
distilling. This Court presumes good faith on behalf of government
officers, which implies that they equally apply the law to all materially
identical individuals. That is why this Court has focused on whether the
state has been enforcing the statute against individuals like the
Plaintiffs—or whether it has not been doing so.

In this case, even if Plaintiffs' evidence "does not make it *certain*
that Plaintiffs[] will be prosecuted, it certainly makes it *credible*."
ROA.581. Plaintiffs need bear no more risk than that to vindicate their
rights through pre-enforcement litigation.

### B. Plaintiffs Have Standing Because the Home-Distilling Ban Precludes Them from Obtaining the Permits Necessary to Distill.

Plaintiffs also have standing because the Home-Distilling Ban on
its face precludes them from obtaining the permits that they need to
distill spirits. The government has never disputed that the Ban
precludes Plaintiffs from obtaining the necessary permits, and it does
not even attempt to argue that that injury is inadequate to support

standing for all of the individual Plaintiffs. Rather than address that head-on, the government instead contends that Plaintiffs' failure to undertake the futile gesture of applying for permits that could not possibly be granted defeats their standing. That is incorrect: as this Court has recognized in case after case, plaintiffs may challenge a law or policy without going through the futility of submitting an application barred by the law or policy.

### 1. Ineligibility for a Distilling Permit Is an Injury in Fact

As an initial matter, an inability to obtain a permit plainly constitutes an injury in fact for purposes of Article III standing. *See, e.g.*, *Ivy v. Williams*, 781 F.3d 250, 253 (5th Cir. 2015), *vacated on other grounds and remanded sub nom., Ivy v. Morath*, 580 U.S. 956 (2016) ("Here, the injury alleged is quite obvious—the named plaintiffs' inability to receive driver education certificates, which in turn prevents them from receiving driver's licenses."); *Kitchen v. Herbert*, 755 F.3d 1193, 1201 (10th Cir. 2014) ("We have no doubt that at least four of the plaintiffs possessed standing to sue the Salt Lake County Clerk based on their inability to obtain marriage licenses from the Clerk's office."); *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.,*

*Tennessee*, 274 F.3d 377, 390 (6th Cir. 2001) ("Because of the civil disabilities provisions, Pendergrass, and consequently the 822 Corporation, was ineligible to receive an operating license. Accordingly, both parties have standing to challenge those provisions"). Indeed, this point is so obvious that, in determining whether a plaintiff claiming such an injury has standing, many courts jump straight to the question whether a plaintiff need not actually apply for the permit because doing so would be futile. *See, e.g., Ellison*, 153 F.3d at 255.

### 2. *Futile Gestures Are Not Required to Establish Standing*

This Court recognized the futility exception to standing in *Moore v. U.S. Dep't of Agric. on Behalf of Farmers Home Admin.*, 993 F.2d 1222, 1224 (5th Cir. 1993). In *Moore*, the U.S. Department of Agriculture ("USDA") denied the Moores the opportunity to buy USDA farmland solely because the Moores were white. USDA sent the Moores a letter that explained the reason for denial: "You have failed to provide proof that you meet the criteria of SDA. (No Whites)." *Id.* at 1222. The government denied that the Moores had standing, arguing that they "never filled out a complete loan application, hence they could never have qualified for the FMHA program." *Id.* at 1223. This Court found

that the Moores "might well not have completed [the application] simply because they had been told, by that same letter, that unless they were members of a minority group FMHA would not consider the application at all, whether or not they completed it." *Id.* at 1224. In short, the letter provided standing to challenge the prohibition. *Id.*

In *Moore,* this Court relied upon *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 365 (1977). That decision similarly identified futility as an exception to the usual requirement of submission to the relevant policy.

Similarly, in *Ellison*, this Court found that the default is that "a plaintiff must submit to the challenged policy," but that there is an exception when "a plaintiff makes a 'substantial showing that application for the benefit ... would have been futile'." 153 F.3d at 254 (citing *Jackson–Bey v. Hanslmaier*, 115 F.3d 1091, 1096 (2d Cir. 1997)).

This Court also approvingly cited *Desert Outdoor Advertising, Inc. v. City of Moreno Valley*, 103 F.3d 814, 818 (9th Cir. 1996). As this Court explained, this case stands for the proposition that "application for sign permits would be futile when city had sued plaintiffs to remove signs, and ordinance 'flatly prohibited' the signs." This shows that a

mere statute that "flatly prohibits" the activity provides standing for

those subject to that prohibition and who wish to challenge it.

In *Ellison,* the plaintiffs wanted to build camp-homes on their

property, but the U.S. Corps of Engineers sent them a letter that "found

it to be in the best interest of the United States to prohibit the

construction or placement of any structures on th[e] land." *Ellison*, 153

F.3d at 250. This Court decided:

> It would have been futile in this case for the Ellisons to
> apply for permits because the Corps sent them a letter on
> October 10, 1995 specifically stating that it would not permit
> the construction or placement of any structures on their
> land. We will not require the Ellisons to ask the Corps for a
> permit to build camp structures when the Corps has already
> made a determination that it will not allow them.
> Accordingly, we hold that the Ellisons had standing to assert
> their due process claims.

*Id.* Therefore, express statements from the agency to the effect that

permit requests simply will not be considered are themselves sufficient

to establish standing to challenge the prohibition.

Likewise, in *Three Expo Events, L.L.C. v. City of Dallas, Texas*

(5th Cir. 2018), this Court found that—after the City of Dallas, through

its officers, formally resolved to ban a sex-themed conference from the

Dallas Convention Center—it was clear error to find that those officers

32

would ever have entered into a contract to use the Convention Center for such a conference. 907 F.3d 333, 339. The City's resolution (and its other related actions) created futility, and that futility created standing. *Id.* at 341-42.

In short: longstanding precedent makes it clear that when a categorical prohibition makes a permit application futile, those affected by the prohibition have standing to challenge it.

### 3. *TTB's Agents, Website, Regulations, and Statutes Showed that Permit Application Would Be Futile*

There are three reasons why an application for a permit in this case would have been futile. First, TTB unambiguously stated on its official platform for questions that it would not consider such applications. Second, the agency's website explains that a "distilled spirits plant may not be located in a residence or in sheds, yards, or enclosures connected to a residence." TTB, Home Distilling (last accessed Dec. 10, 2024), https://www.ttb.gov/regulated-commodities/beverage-alcohol/distilled-spirits/penalties-for-illegal-distilling. Third, both the statute and TTB's regulations unambiguously prohibit the issuance of the permit for home distilling. 26 U.S.C. § 5178(a)(1)(B); 27 C.F.R. § 19.52(a); 27 C.F.R. § 19.51.

TTB's website—on the page titled "Distilled Spirits Industry," at the section titled "Contact Us"—states: "If you have questions regarding permits, applications, bonds, tax payments, etc., you may contact the National Revenue Center at ttbspirits@ttb.gov or at 877-882-3277 (Toll Free)." TTB, Distilled Spirits Industry (last accessed Dec. 10, 2024), https://www.ttb.gov/regulated-commodities/beverage-alcohol/distilled-spirits. That same number is provided on the form for a distilled spirits permit; the form tells its readers to "contact this office if you have questions." ROA.202.

Plaintiffs contacted TTB's National Revenue Center at the number provided by TTB above. Plaintiffs asked TTB's officer what the prospects were for the issuance of a license for Plaintiffs to distill at home. A recording of this call was entered into evidence; the government does not dispute that such a call occurred on November 27, 2023, and it is summarized immediately below.

Plaintiffs' counsel told TTB's officer, "I am an attorney representing five clients. My clients are interested in getting a permit to distill alcohol at home," then asked, "Is that something that TTB would consider?" ROA.517. The TTB Officer responded, "They would not. It's

against the law." *Id*. Later in that conversation with TTB, Plaintiffs'
counsel asked to confirm, "just to summarize: you guys might consider a
permit for the manufacture of fuel alcohol, but you won't consider a
permit for the manufacture of beverage alcohol. Is that right?" *Id*. The
TTB Officer responded: "Correct." *Id*. These were clear and definitive
statements, and they repeatedly and categorically confirmed that TTB
would not consider any such permits.

These statements from TTB, which use the official channels of
communication that are officially provided by TTB for the express
purpose of discussing official business, provide substantial evidence
that the application for the home distilling permit would have been
futile. Such futility provides Plaintiffs standing to challenge the
inability imposed upon them to distill at home due to the lack of a
permit.

TTB's website explains that TTB will not issue such licenses. TTB,
Home Distilling (last accessed Dec. 10, 2024),
https://www.ttb.gov/regulated-commodities/beverage-alcohol/distilled-
spirits/penalties-for-illegal-distilling. That website states: "While
individuals of legal drinking age may produce wine or beer at home for

personal or family use, Federal law strictly prohibits individuals from producing distilled spirits at home." *Id.* It adds, "Under 26 U.S.C. 5178(a)(1)(B), a distilled spirits plant may not be located in a residence or in sheds, yards, or enclosures connected to a residence." *Id.* Based on these statements, any reasonable person would conclude that TTB would not issue a license to distill spirits at home. In short, TTB's posture renders application futile.

The statute expressly states, "No distilled spirits plant for the production of distilled spirits shall be located in any dwelling house, [or] in any shed, yard, or inclosure connected with any dwelling house." 26 U.S.C. § 5178(a)(1)(B). The statutory language demonstrates that any application for a permit that anticipates expressly prohibited conduct is a futile gesture.

TTB has followed the statute's lead: TTB has issued regulations that prohibit issuing licenses to people who wish to distill at home. Specifically, "A person who intends to establish a distilled spirits plant may not locate it in any of the following places: (a) In any residence, shed, yard, or enclosure connected to a residence." 27 C.F.R. § 19.52(a). Furthermore, Appellant TTB's regulation requires that "A person may

not produce distilled spirits at home for personal use." 27 C.F.R.

§ 19.51. TTB's website and regulations demonstrate the futility of any

Plaintiff's application for a permit.

Plaintiffs have done everything they could reasonably do to distill

at home. Plaintiffs have concrete and immediately operationalizable

plans, not vague or hypothetical intentions. They have a demonstrated

desire to begin as soon as reasonably possible, so long as criminal

liability doesn't stand in the way. Were Plaintiffs unhampered by

permit requirements, they would already have begun to distill at home

by now. All Plaintiffs, not just McNutt, have demonstrated their own

interest in this pursuit. ROA.109-116. The bottom line is that, under

these statutes and regulations, any reasonable person would conclude

that any request for a home distillery permit would be futile.

## II. The Home-Distilling Ban Is Not A Necessary or Proper Means of Execution of the Power to Collect Taxes

The government has retreated to "the last, best hope of those who

defend ultra vires congressional action, the Necessary and Proper

Clause," but the district court correctly concluded that the Home-

Distilling Ban is not authorized by that clause. *Printz v. United States*,

521 U.S. 898, 923 (1997). To determine if a statute is valid under the

Necessary and Proper Clause, courts apply the test from *McCulloch v. Maryland*: "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist[ent] with the letter and spirit of the constitution, are constitutional." 17 U.S. 316, 421 (1819).

The government asserts that a "law is necessary and proper if it is 'convenient' or 'useful' for carrying an enumerated power into execution," which in this case is the power to collect taxes. Government's Br. 23. This is wrong, and it explains why the government fundamentally fails to grapple with the district court's conclusion. A "necessary" law not only must be "conducive to the [enumerated power], but also 'plainly adapted' to that end." *Jinks v. Richland Cnty., S.C.*, 538 U.S. 456, 462 (2003). And just because a law is "necessary," that does not make it "proper." *Printz v. United States*, 521 U.S. 898, 924 (1997). The Home-Distilling Ban flunks *McCulloch*'s test in three respects: the means of execution used are (1) not "within the scope of the constitution['s]" tax power or "consist[ent] with the letter and spirit of the constitution", (2) not "plainly adapted" to

38

collecting federal taxes, and (3) lack the required means-ends fit to the enumerated power.

*First*, one of several requirements for some particular means of execution to be proper is that the means must be within the "scope of the constitution" and be "consist[ent] with the letter and spirit of the constitution," *McCulloch*, 17 U.S. at 413. In other words, the means used must fall within "the scope of federal authority." *NFIB v. Sebelius*, 567 U.S. 519, 572 (2012). Of course, it is possible that a means of execution may exceed the proper scope of one enumerated power while fitting within the proper scope of another. *Id.* (In *NFIB*, for example, the Supreme Court concluded that the individual mandate fell outside the Commerce Clause's scope of authority but within the taxing power. *Id.*) Here, the lower court correctly held that the means of execution fell outside the proper scope of the tax power. This is explained further in Section A below.

*Second*, in order for a means of execution to be necessary, it must be "plainly adapted" to the enumerated power. In other words, the means must have a "real or substantial relation to the enforcement of the" enumerated power. *James Everard's Breweries v. Day*, 265 U.S.

545, 560 (1924). Here, the district court correctly found that the means used were not plainly adapted because they "regulated behavior separate from the logistics of liquor taxes." ROA.594. Instead, the statute used a "criminal provision that, by its own text, makes no meaningful connection to the mechanisms by which those taxes are assessed and collected." ROA.597. This is explained further in Section B below.

*Third*, and furthermore, in order for a means of execution to be necessary, there also must be a but-for causal chain that must connect the means used to the enumerated power it seeks to implement. Although the district court avoided determining whether the Home-Distilling Ban satisfied the means-end test, the government has failed to provide the required chain of reasoning that joins an exercise of constitutional power to the power itself. This is explained further in Section C below.

## A. The District Court Correctly Limited Congress's Tax Power to Its Proper Scope

*McCulloch* emphasized that the necessary and proper exercise of an enumerated power must clearly be "within the scope of the constitution" and "consist[ent] with the letter and spirit of the

40

constitution." 17 U.S. at 421. The district court correctly held that Congress's tax power is limited to directing payment to the federal treasury; the power's use cannot otherwise dictate individual behavior. This limitation fences off the prospect of the Home-Distilling Ban from being a proper means of implementation of the power to collect taxes.

The Necessary and Proper Clause "does not license the exercise of any 'great substantive and independent power[s]' beyond those specifically enumerated." *NFIB*, 567 U.S. at 559 (quoting *Kinsella v. United States ex rel. Singleton,* 361 U.S. 234, 247 (1960) (quoting VI Writings of James Madison 383 (G. Hunt ed. 1906))). Rather, the Necessary and Proper Clause functions as "merely a declaration, for the removal of all uncertainty, that the means of carrying into execution those [powers] otherwise granted are included in the grant." *Id.* In other words, the scope of the enumerated power must be identified to determine when some use of that power crosses the line and itself becomes the realization of a second "great substantive and independent power." Crossing that line creates an improper expansion of federal authority. *See Afroyim v. Rusk*, 387 U.S. 253, 260 (1967) ("[I]f the

Constitution had intended to give to Congress so delicate a power, it would have been expressly granted." (quotation marks omitted)).

The Home-Distilling Ban is not a proper exercise of the power to collect taxes because it "criminalize[s] conduct of persons not subject to the tax, because the tax liability exists only 'from the time the spirits are in existence until such tax is paid.' " ROA.595. Rather than collecting revenue, the provisions at issue ban conduct before tax liability is even created. ROA.595. Put another way, the Home-Distilling Ban *criminalizes* taxable activity and *prevents* Plaintiffs from actually paying the tax on distilled spirits.

The problems with the Home-Distilling Ban become even more apparent once one understands the Supreme Court's carefully delineated limits of Congress's taxing power, which the Supreme Court has "policed … aggressively, invalidating punitive exactions obviously designed to regulate behavior otherwise regarded at the time as beyond federal authority." *NFIB*, 567 U.S. at 572. "[A]lthough the breadth of Congress's power to tax is greater than its power to regulate commerce, the taxing power does not give Congress the same degree of control over individual behavior." *Id.* at 573. The farthest limit of the power to tax

42

"nonetheless leaves an individual with a lawful choice to do or not do a certain act, so long as he is willing to pay a tax levied on that choice." *Id.* at 574. "Of course, individuals do not have a lawful choice not to pay a tax due, and may sometimes face prosecution for failing to do so." *Id.* at 574 n.11. "But that does not show that the tax restricts the lawful choice whether to undertake or forgo the activity on which the tax is predicated." *Id.*

In other words, the "power to tax is not the power to destroy while this Court sits." *Id.* at 573 (quoting *Oklahoma Tax Comm'n* v. *Texas Co.*, 336 U.S. 342, 364 (1949)). This limitation on the scope of the taxing power ensures that the means used do not exceed that power's proper limits. This limit is central to the assertion of authority at issue in this case. Yet "destroy" is exactly what the Home-Distilling Ban does—it eviscerates a category of taxable activity.

The Supreme Court's discussion of the limits of federal authority under the Commerce Clause in *NFIB* is instructive. 567 U.S. at 557. In *NFIB*, the government attempted to base the exercise of constitutional authority on a future and hypothetical event, claiming that it is "sufficient to trigger Congress's authority that almost all those who are

43

uninsured will, at some unknown point in the future, engage in a health care transaction." *Id*. Because " '[t]here is no temporal limitation in the Commerce Clause,' the Government argue[d] that because '[e]veryone subject to this regulation is in or will be in the health care market,' they can be 'regulated in advance.' " *Id*.

The government's argument failed there, perhaps in part because of its paradoxical nature; nonetheless, the government attempts a similar stratagem here. It argues that homeowners might someday "conceal a spirit's strength—or conceal a distilling operation altogether," and that this *future, unrealized possibility* gives the government the authority to regulate homeowners' behavior *today*. Government's Br. 8. As the district court recognizes, the statutes "*anticipate* that one who distills liquor at home may attempt to distribute it in violation of some other federal law." ROA.603 (emphasis in original). This argument fails for the same reason it did in *NFIB*: "[t]he proposition that Congress may dictate the conduct of an individual today because of prophesied future activity finds no support in our precedent." *NFIB*, 567 U.S. at 557.

The government in *NFIB* attempted to use this kind of hypothetical, unrealized event as a foundation for the "extraordinary ability to create the necessary predicate to the exercise of an enumerated power." *Id.* at 560. Although the "necessary predicate" under the Commerce Clause in *NFIB* was the economic activity that the government was creating, the "necessary predicate" under the Tax Clause in this case is the act that creates tax liability—here, home distilling. In this case, the government justifies its authority under the power to collect taxes in much the same way: it uses its authority in an attempt to prohibit the very act that is the necessary predicate for its authority—and that maneuver does not work.

Relatedly, in the *License Tax Cases*, 72 U.S. 462 (1866), the Supreme Court considered the constitutionality of a statute requiring retailers selling lottery tickets and liquor to obtain a license, which facilitated payment of a special tax. 13 Stat. 223 (1864), as amended by 14 Stat. 98 (1866). The Supreme Court held that the statutes were constitutional, but only because the licenses gave the holders no authority to carry on such trades in violation of state law. *See License Tax Cases*, 72 U.S. at 470. The Court explained that the taxing power

gives Congress "no power of regulation nor any direct control" over "commerce and trade." *Id.* at 470–71. "No interference by Congress with the business of citizens transacted within a State is warranted by the Constitution, except such as is strictly incidental to the exercise of powers clearly granted to the legislature," and "Congress cannot authorize a trade or business within a State in order to tax it." *Id.* at 471. Here, Home-Distilling Ban exercises "direct control" over Plaintiffs personal conduct and is not "strictly incidental" to the collection of the distilled spirits tax. Just like federal authorization of an activity in order to tax it exceeds Congress's taxing power, the government's prohibition of an activity offends core state police powers and thus is inconsistent with the "letter and spirit of the constitution." *McCulloch*, 4 Wheat. at 421.

For the same reason as in *NFIB* and *License Tax Cases*, the government's "conception of the Necessary and Proper Clause would work a substantial expansion of federal authority." *NFIB*, 567 U.S. at 557. When the government claims the authority to ban incurring a tax liability out of fear of future tax avoidance, this invites a question: what cannot be banned? After all, any at-home activity might be taxed. The

government's ability to detect other activities is not especially different from its ability to detect distilling. Notice what logically follows: the government's argument inescapably implies a federal ability to ban any at-home activity once a tax is imposed on it. Indeed, the government could ban home-based employment or even small businesses on the grounds that such individuals and entities are more likely to conceal income. And that cannot be right: as the Supreme Court has warned us, the Constitution "must be read carefully to avoid creating a general federal authority akin to the police power." *NFIB*, 567 U.S. at 536.

This is not the only respect in which the government's theory of federal powers has impossible and indefensible implications. If the government's claims are accepted, the federal government could then selectively offer to waive its prohibitions as long as the targeted individual agrees to follow the federal government's rules. This is anything but a theoretical problem or far-fetched example: it is just what the federal government did in *Carter v. Carter Coal Co.*, 298 U.S. 238 (1936).

In *Carter Coal*, the federal government wanted to regulate the bituminous coal-mining industry. Supreme Court precedent at the time

made it clear that such regulation could not rest on the Commerce Clause. So the federal government created a tax that it knew no one could both pay and stay in business, then it offered to waive that tax if the business obeyed the federal government's regulatory commands. The Supreme Court recognized that "It is very clear that the 'excise tax' is not imposed for revenue but exacted as a penalty to compel compliance with the regulatory provisions of the act." *Carter Coal*, 298 U.S. at 289.

What if, rather than offering to waive a tax, the federal government could just ban the activity unless the offeree agreed to follow the government's regulations? The federal government cannot be allowed the power to ban any activity it wishes; furthermore, such authority simply cannot rest on the hypothetical existence of a future tax coupled with discretionary authority to waive it. That logic would allow the federal government to be "everywhere extending the sphere of its activity, and drawing all power into its impetuous vortex." The Federalist No. 48 (J. Madison). That is the opposite of the limited and enumerated powers that our Constitution creates.

To prevent this expansion of federal authority, the tax power is limited such that "the taxing power does not give Congress the same degree of control over individual behavior." *NFIB*, 567 U.S. at 573. The Constitution thus requires that the taxing power "leaves an individual with a lawful choice to do or not do a certain act, so long as he is willing to pay a tax levied on that choice." *Id.* at 574. Nonetheless, these statutes prohibit the ability of the Plaintiffs to distill at home, even though they are willing to pay the tax levied on that choice. The Home-Distilling Ban takes away Plaintiffs' choice to pay the tax. That is not a proper means of exercising the tax power, and it cannot be within the scope of the constitutional power as described in *McCulloch*.

Limiting federal authority to the scope of the Constitution's enumerated powers preserves the proper balance between federal and state sovereignty. It enforces the distinction that the "Constitution requires … between what is truly national and what is truly local." *United States v. Morrison*, 529 U.S. 598, 599 (2000). It is the states, not the federal government, that should decide if distilling spirits should be banned at home.

49

## B. The District Court Correctly Held That Prohibiting the Creation of a Tax Liability Cannot Be Plainly Adapted to Federal Tax Collection

The lower court correctly held that the home distilling ban is "not plainly adapted to executing the taxing power"; that is because its provisions "are not meaningfully connected to the modus operandi of spirits taxes." ROA.596. Yet in order for a means of execution to be necessary, it must be "plainly adapted" to the enumerated power. *McCulloch*, 17 U.S. at 421. This means that a measure must have a "real or substantial relation to the enforcement of the" enumerated power. *James Everard's Breweries v. Day*, 265 U.S. 545, 560 (1924).

A measure is not "plainly adapted" simply because it has an "attenuated effect" on tax collection. *Morrison*, 529 U.S. at 615. A chain of causal inferences "must be controlled by some limitations lest, as Thomas Jefferson warned, congressional powers become completely unbounded by linking one power to another ad infinitum in a veritable game of 'this is the house that Jack built.'" *United States v. Comstock*, 560 U.S. 126, 150 (2010) (Kennedy, J., concurring). Instead, a measure must have "an immediate and appropriate relation" to an authorized object and not merely "a *tendency* only to *promote*" it. James Madison,

50

The Report of 1800;[3] *see also Sabri v. United States*, 541 U.S. 600, 613 (2004) (Thomas, J., concurring) (the Clause requires an "obvious, simple, and direct relation").

The Home-Distilling Ban fails this test. Indeed, "the plain text of the challenged provisions makes no reference to any mechanism or process that operates to protect revenue." ROA.596. Prohibiting a person from incurring a tax liability is essentially unrelated to collecting taxes.

The district court decision mirrors the Supreme Court's reasoning in *United States v. Dewitt*, 76 U.S. 41, 44 (1869), as discussed below. When applying the "plainly adapted" requirement, the Supreme Court has consistently held that for a means to be valid under the Necessary and Proper Clause, there must be a "real or substantial relation to the enforcement of the" enumerated power. *James Everard's Breweries v. Day*, 265 U.S. 545, 560 (1924); *see also N.L.R.B. v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37 (1937) (requiring a "close and substantial relation" between the means and the enumerated power); *Wickard v.*

---

[3] *Available at https://founders.archives.gov/documents/Madison/01-17-02-0202* (last visited Dec. 10, 2024).

*Filburn*, 317 U.S. 111, 123 (1942) (same, quoting *Houston, E. & W.T.R. Co. v. United States*, 234 U.S. 342, 351 (1914)).

Although *A.L.A. Schechter Poultry Corp. v. United States* (1935) is best known for its nondelegation holding, it also found "no direct relation" between the hour and wage regulations at issue and interstate commerce under the Commerce Clause. 295 U.S. 495, 546. The government's argument that the "indirect effects" on interstate commerce permitted the regulation of hours and wages was rejected because it lacked a sufficiently close relationship to interstate commerce.

In *Jones & Laughlin Steel Corp.* the Supreme Court found that, under certain circumstances, union-related work stoppages had a "*close and substantial relation* to interstate commerce" and that, in those circumstances, "control [of those stoppages] "is essential or appropriate to protect that commerce from burdens and obstructions." 301 U.S. at 37 (emphasis added). Likewise, in *Wickard*, the Court found "federal intervention constitutionally authorized because of 'matters having such a *close and substantial relation* to interstate traffic that the control

52

is essential or appropriate to the security of that traffic." 317 U.S. at 123 (emphasis added) (quoting *Houston*, 234 U.S. at 351).

The Court has previously rejected the notion that a prohibition similar to the Home-Distilling Ban was plainly adapted under the Necessary and Proper Clause in *United States v. Dewitt*, 76 U.S. 41, 44 (1869). Specifically, Congress's prohibition of the mixing of naphtha and illuminating oils, 14 Stat. at Large, 484, Sec. 29, triggered this case. The government tried to justify its criminal prohibition under the Commerce Clause and the taxing power, just as the government did in the court below here. However, the Supreme Court rejected these justifications as "too remote and too uncertain to warrant us in saying that the prohibition is an appropriate and plainly adapted means for carrying into execution the power of laying and collecting taxes." *Dewitt*, 76 U.S. at 44. That prohibition was deemed by the Supreme Court to be "plainly a regulation of police"—that is, a reference to a police power that the federal government does not possess. *Id.*

More recently, in *United States v. Lopez*, 514 U.S. 549 (1995), the Supreme Court held the Gun-Free School Zones Act to be unconstitutional because its connection to interstate commerce was too

attenuated. Any relationship between guns near schools and interstate commerce was deemed insubstantial relative to the enumerated power. *Lopez* involved "a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." 514 U.S. at 561.

Similar to *Dewitt* and *Lopez*, the district court's analysis of the Home-Distilling Ban found that "Congress has criminally prohibited the simple possession of the apparatus used to produce that taxable commodity." ROA.596-97. The court characterized the prohibition as "a criminal provision that, by its own text, makes no meaningful connection to the mechanisms by which those taxes are assessed and collected." ROA.597. Ultimately, the court concluded that the prohibition of home distilling "is not a sufficiently clear corollary to the positive power of laying and collecting taxes." ROA.597.

In *Lopez*, the Supreme Court noted that the statute "contains no jurisdictional element which would ensure, through case-by-case inquiry, that [the statute] in question affects interstate commerce." *Lopez*, 514 U.S. 561. Similarly, the statutes in this case lack the necessary jurisdictional hook: here, the district court found "no

reference to any mechanism or process that operates to protect revenue." ROA.596.

The government attempts to address the problem of the absent jurisdictional hook by noting that "Congress is not required to reference revenue protection in each statutory subsection." Government's Br. 21. But this glib dismissal of the problem fails: whether a jurisdictional hook is expressed or implied, the statute's connection to the enumerated power must still be "In a manner to be easily seen or comprehended"; or "Evidently; clearly; not obscurely" (using the definition of "plainly" in N. Webster, American Dictionary of the English Language (1828)); or, in other words, have a "close and substantial relation" between the means and the enumerated power. *Jones & Laughlin Steel Corp.*, 301 U.S. at 37. The jurisdictional hook, although not required, makes the relationship more obvious and easier to identify—and thus more likely to demonstrate a plainly adapted connection between the means used and the enumerated power.

The government also claims that various other "statutory and regulatory requirements governing the production, importation, or sale of distilled spirits and other taxable products" would be endangered if

this Court recognized that the Home-Distilling Ban was not plainly adapted to collecting taxes. But the Home-Distilling Ban is categorically different from those regulations because it criminalizes a taxable activity and actually prevents Plaintiffs from distilling and paying the resulting tax. The evident distinction between the government's cited statutory and regulatory requirements and the Home-Distilling Ban only underscores why the Home-Distilling Ban is not a plainly adapted measure for collecting the distilled spirits tax:

- With respect to **licenses and registration**, as early as the *License Tax Cases*, the Supreme Court recognized the limitations of Congress's power to issue licenses solely under the taxing power.

  > The power to tax is not questioned, nor the power to impose penalties for nonpayment of taxes. The granting of a license therefore must be regarded as nothing more than a mere form of imposing a tax, and of implying nothing except that the licensee shall be subject to no penalties under national law if he pays it.

  72 U.S. at 471. Such tax-power licenses are not discretionary; they are "shall issue" licenses if the requirements needed to collect taxes are satisfied, because "[t]hey are mere receipts for taxes." *Id.* at 472.

- **Security requirements**, such as lock requirements, that ensure that only licensed individuals distill and, for the same reason as licenses, are plainly adapted to the execution of the tax power.

- Requirements related to **the collection and measurement of spirits** are plainly adapted to tax collection. That is because once people distill spirits, they owe taxes, and such requirements ensure accurate tax payment. Likewise, these rules enable **inspections** to confirm that the correct amount of taxes have been paid. Uncontroversially, ensuring accurate payment of taxes is plainly adapted to the execution of the tax power.

- **Bond requirements** are also plainly adapted to federal tax collection. These requirements do not prevent anyone from distilling spirits and incurring the tax. Instead, bond requirements simply ensure that those with tax obligations cannot avoid paying them by fleeing. Those requirements are plainly adapted to federal tax collection because, as described

by the district court, ROA.596, they align with "the modus operandi of spirits taxes."

- Restrictions on **additions to goods** ensured that the weight and size of the good would be consistent. Size and weight served as a good proxy for the amount of taxed goods when compared to the amount of taxes paid. Suppose a seller overfilled a whiskey bottle and paid taxes on less than its actual volume. These restrictions allow detection of such fraudulent conduct: the prohibition on adding other goods is only triggered when the taxed activity has occurred and the goods are sold. The prohibition on changing the quantity of a taxed good was more of a concern when tax stamps were issued; it served the purpose of ensuring the taxed product matched the tax stamp, and it was plainly adapted to collecting federal revenue.

- **Restrictions on packaging** are also plainly adapted to the execution of the tax power. The federal government originally imposed these restrictions to counter failures in revenue collection caused by corrupt federal officers. *See* Statement of

58

the Case. To address this, Congress once required tax stamps on bottles of spirits; that was the status quo until the Tax Reform Act of 1984, which was part of the Deficit Reduction Act of 1984, ended this practice by replacing tax stamps with anti-tamping closures. P.L. 98-369. Even though this requirement no longer exists, the reason that previous courts found it plainly adapted to tax collection is worth mentioning. The purchaser of a good with a tax stamp can recognize that the relevant tax has already been paid; the stamped good is thus distinguished from illicit goods. Such requirements are plainly adapted to collecting federal revenue, because they create an obligation that is triggered only at the creation of tax liability and only ensure transparency in tax payments. Prohibiting the re-filling of tax-paid-stamped bottles served a similar purpose. The use of tax stamps—familiar from pre-Revolutionary England—would have been understood by the Constitution's ratifiers as a logical implication of the power to collect taxes.

The government's cited cases only prove this point. For example, *Stilinovic* upheld liquor-labeling requirements that enabled the

government to perform "a check upon whether the bottle contains the whiskey upon which the tax was paid as manifested by the tax stamp" and thus bore "a reasonable relationship to the collection of revenue." *Stilinovic v. United States*, 336 F.2d 862, 864–65 (8th Cir. 1964). *Felsenheld* similarly upheld a cigarette-labelling provision (in support of a tax on cigarettes) requiring that the contents in cigarette packages match the label. *Felsenheld v. United States*, 186 U.S. 126, 133 (1902).

In contrast to these ministerial provisions, the Home-Distilling Ban is more like the invalid provision in *Dewitt*. In *Dewitt*, the Supreme Court unambiguously distinguished between requirements for the packaging of taxed products and a blanket criminal prohibition. *Dewitt*, 76 U.S. at 44. The Court noted that the analogy to "the mode of packing various manufactured articles" "appears to fail at the essential point, for the regulations referred to are restricted to the very articles which are the subject of taxation." *Id.* In the case at hand, the government has challenged the district court opinion that distinguished those regulations that "touch the product to be taxed," ROA.596, from the blanket criminal prohibition at issue here, Government's Br. 21, but the government's challenge to the district court's reasoning cannot be

reconciled with *Dewitt*. The Supreme Court recognized that although the packaging of goods in the marketplace can be regulated if it helps collect taxes, a criminal prohibition that controls underlying individual behavior is not "plainly adapted" to statutory ends, *Dewitt*, 76 U.S. at 44, just as the district court held in this case.

*     *     *

The requirement of plain adaptation rests on a crucial constitutional value: ensuring that the government has the consent of the governed. Ratifiers of the Constitution were intent on ensuring that all powers granted to the federal government would be limited to those having a direct relation to enumerated powers. Without a requirement of plain adaptation, James Madison's fears would materialize:

> In the great system of Political Economy having for its general object the national welfare, everything is related immediately or remotely to every other thing; and consequently a Power over any one thing, *if not limited by some obvious and precise affinity*, may amount to a Power over every other. Ends & means may shift their character at the will & according to the ingenuity of the Legislative Body. What is an end in one case may be a means in another; nay in the same case, may be either an end or a means at the Legislative option. The British Parliament in collecting a revenue from the commerce of America found no difficulty in calling it either a tax for the regulation of trade, or a regulation of trade with a view to the tax, as it suited the argument or the policy of the moment.

61

8 The Writings of James Madison 448, letter from James Madison to Spencer Roane (Sept. 2, 1819) (emphasis added).

The requirement of plain adaptation assesses whether the kind of authority claimed (for instance, one or more of the powers in boldface described immediately above) would have been understood as implied by the enumerated power when the Constitution was ratified. Although the government claims this power is not "so attenuated as to undermine the enumeration of powers set forth in Article I, § 8," Government's Br. 21, it fails to explain why tax collection would reasonably have been expected by the Constitution's ratifiers to entail prohibiting individuals from incurring a tax liability. The Home-Distilling Ban flunks the test of plain adaptation because it isn't a clear or easy-to-comprehend incidental part of the power to collect taxes. That is why the district court found "it is not a sufficiently clear corollary to the positive power of laying and collecting taxes." ROA. 597. In short, the prohibition on home distilling is not plainly adapted to federal tax collection.

### C. Home Distilling Ban Fails the Means-Ends-Fit Test That Use of the Tax Power Requires

Finally, the Home-Distilling Ban also falls outside the Necessary and Proper Clause because it does not satisfy the "means-ends" test

described in *McCulloch*, which requires that courts look for a "causal connection," *Gonzales v. Raich*, 545 U.S. 1, 20 (2005), or if more than one step, a "but-for causal chain." *U.S. v. Morrison*, 529 U.S. 598, 615 (2000). The government correctly notes that the "Supreme Court has rejected the proposition that the 'Necessary and Proper Clause permits no more than a single step between an enumerated power and an Act of Congress.' " Government's Br. 20-21 (citing *Comstock*, 560 U.S. at 148). Instead, what is necessary is for a sequence of "link[s]" to extend from the means used to the enumerated power, *NFIB*, 567 U.S. at 556, in a manner that creates a "causal chain of federal powers," *Comstock*, 560 U.S. at 150 (Kennedy, J., concurring). But it is crucial for this chain of inferences to be "rationally related to the implementation of" the enumerated power. Government's Br. 15. However, the Court "certainly did not import the *Lee Optical* rational-basis test into this arena." *Comstock*, 560 U.S. at 152 (Kennedy, J., concurring). *Lee Optical*'s approach contains the right test for a Due Process challenge that alleges utter irrationality, and that test succeeds only when utter irrationality is discovered. But the test for the Necessary and Proper Clause is quite different:

[Supreme Court] precedents require a tangible link to commerce, not a mere conceivable rational relation, as in *Lee Optical*. " '[S]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so.' " *Lopez, supra,* at 557, n. 2 (quoting *Hodel, supra,* at 311 (Rehnquist, J., concurring in judgment)). The rational basis referred to in the Commerce Clause context is a demonstrated link in fact, based on empirical demonstration.

*Id*. In other words, the government must provide empirical evidence that supports its claims. That evidence must then lead a rational and objective observer to conclude, through a chain of multiple inferences if needed, that the exercise of the enumerated power would be compromised if those means were not employed. That test, when applied here, shows that the government has not provided evidence demonstrating a necessary causal connection between the home distilling ban and the power to collect taxes.

The government's assertion that a home "distiller can more easily conceal a spirit's strength (and thus avoid the proper tax rate)—or conceal a distilling operation altogether—if his still is in his house or connected with it," Government's Br. 16, lacks a factual basis. No facts are cited to support this claim, nor has the government presented any in the record.

Plaintiffs seek a permit to distill at home. The government's argument that individuals like the Plaintiffs are better equipped to "conceal a distilling operation altogether" if given a permit is unserious. A request for a permit quite literally publicizes a distilling operation; the request itself provides transparency to regulators, thus rendering the government's fear of concealment baseless.

Moreover, any remaining concern about concealment is resolved by 26 U.S.C. § 5203. Under § 5203(a), if granted a permit, Plaintiffs would be required to "furnish the Secretary such keys as may be required for internal revenue officers to gain access to the premises and any structures thereon, and such premises shall always be kept accessible to any officer having such keys." Furthermore,

> It shall be lawful for any internal revenue officer at all times, as well by night as by day, to enter any distilled spirits plant, or any other premises where distilled spirits operations are carried on, or structure or place used in connection therewith for storage or other purposes; to make examination of the materials, equipment, and facilities thereon; and make such gauges and inventories as he deems necessary.

26 U.S.C. § 5203(b). In effect, those who request a permit waive their Fourth Amendment rights and allow revenue officers to enter the location that the permit specifies at any time, day or night, to ensure

compliance. Indeed, the government's brief states that "internal revenue officers may enter a distilled spirits plant at any time to examine it and take inventory as necessary. *Id*. § 5203(b)." Government's Br. 4. It's hard to imagine how concealment might become a worse problem when the permitting process requires distillers *disclose* their distilling activity to the government and to (figuratively) roll out the red carpet to government investigators 24 hours a day. The logic is inescapable: it's easier to conceal such operations without requesting or receiving a permit, and the permit itself makes distilling operations legible to the government.

Assume that a building complies with all of the regulations to legally distill alcohol, what rationale exists to argue that adding a bed to this building makes concealment easier? There doesn't appear to be any logical basis for the government's claims, let alone a factual basis.

The government's inconsistency is further illustrated by its differing treatment of distilled spirits for fuel use rather than beverage use. Appellant TTB has issued permits to distill for fuel production at rural farming houses, but not for the production of beverages. The TTB agent on the recorded phone call that has been introduced into

evidence, ROA.517, even noted that residences in rural areas would be allowed permits to distill alcohol for fuel use. ROA.517. Since fuel alcohol and beverage distilled alcohol are chemically identical, the government's selective restrictions on beverage distillation lack any coherent rationale. If home distilling beverages pose such a danger to federal revenue, why permit fuel distillation at home?

Moreover, home-based creation of alcoholic beverages, such as beer and wine, leads to the payment of excise taxes to the federal government without compromising federal tax collection. Why is it that at-home beer brewing and at-home wine fermentation do not lead to these problems, but at-home distilling does?

Indeed, the range of home-based businesses that pay federal taxes is vast, extending far beyond brewing and fermentation. Millions of Americans operate home-based businesses and accurately report taxes. Nearly two-thirds of professional, scientific, and technical services are home-based businesses. ROA. 15 ¶18; U.S. Small Business Administration Office of Advocacy, *Frequently Asked Questions* 3 (Sept. 2019), https://advocacy.sba.gov/wp-content/uploads/2019/09/Frequently-Asked-Questions-Small-Business-2019-11.pdf. According to the Internal

Revenue Service, "Most taxpayers with home-based businesses accurately report their income and expenses while still enjoying the benefits that a home-based business can offer." I.R.S., Business use of your home (last accessed Jan. 18, 2024),

https://web.archive.org/web/20240118021223/https://www.irsvideos.gov/Business/SBTW/Lesson4. Millions of home-based businesses report their income under this system, and there is no reason why home distillers cannot do the same.

The government suggests that a backyard still, openly visible to neighbors and passersby, is somehow easier to conceal than a still with a shed around it that prevents people from seeing inside. This notion defies logic—if concealment were a concern, a shed is far more opaque than a backyard.

Without a rational basis for its assertions that home distilling poses a greater risk than commercial locations, the government's position even fails the Due Process Clause standard; it is entirely irrational. Moreover, the Necessary and Proper Clause demands not mere rationality but a demonstrated factual connection from the means at issue to an enumerated power.

In any case, any position on this question requires proof that rests on a factual basis. The government is without any avenue to provide that proof on appeal. It finished its briefing without adding a single piece of evidence that demonstrates anything about home distilling's concealability. The government has missed the deadline to present the facts it would need to shoulder its evidentiary burden.

Even presuming that Congress asserted in the legislative history that home distillers made tax evasion easier to conceal—and it did not—that would not be enough to justify the Home-Distilling Ban. Directly enacted congressional statutory findings would not be enough. In *Lopez* and *Morrison*, the Supreme Court recognized that under the Necessary and Proper Clause even if "Congress may conclude" such facts that does not "necessarily make it so." *United States v. Morrison*, 529 U.S. 598, 614 (2000); *Lopez,* 514 U.S. at 557, n. 2 (quoting *Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 308 (1981) (Rehnquist, J., concurring in judgment); *see also Comstock*, 560 U.S. at 152 (Kennedy, J., concurring).

Even if, hypothetically, the government could somehow prove that in 1868, when the prohibition was enacted, it was necessary to ban

home distilleries to protect the federal revenue—and it was not—those facts are without any logical relationship to the present day. *See Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 554 (2013) (finding a statute unconstitutional on the basis that "40–year–old facts hav[e] no logical relation to the present day.")

To justify the Home-Distilling Ban, the government would need to show both that they presented facts that would demonstrate to the district court that home distilling was easier to conceal than other locations, and that the district court committed error in failing to find such facts. But the government is missing the start of the required logical chain—what are the facts that demonstrate this conclusion? First, the government must produce them; second, the government must use them to show the comparative ease of home distillery concealment. They have not and cannot do so. Not only is there not a shred of evidence that the ban is necessary to collect the tax on distilled spirits, the government's concealment rationale is logically indefensible given that distillers are required to disclose their still to and obtain a permit from the government.

Without establishing a logical chain of reasoning from the facts of home distilling that prove that it is peculiarly likely to foster diversion of tax revenue, the Home-Distilling Ban fails the Necessary and Proper Clause's means-end-fit test.

## III. The Government's Brand-New Criticisms of the Scope of the Remedy Are Forfeited as Not Raised Below.

In Plaintiffs' opening complaint, their prayer for relief expressly asked the court to "Issue a preliminary and permanent injunctive relief enjoining Defendants from enforcing 26 U.S.C. § 5601(6), 26 U.S.C. § 5178(a)(1)(B), and any regulation issued under those statutes." ROA.21. If the government had any concerns about the scope of relief requested, its lower-court filings should have addressed those concerns. Its failure to do so means that it has forfeited any objections to the scope of the remedy.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's holding that Plaintiff McNutt and the Hobby Distillers Association have standing, reverse the district court's holding that the Cross-Appellants lack standing, and affirm the district court's judgment in favor of Plaintiffs on the merits.

Dated: December 11, 2024

Respectfully submitted,

/s/ *Devin Watkins*
Devin Watkins
Dan Greenberg
COMPETITIVE ENTERPRISE INSTITUTE
1310 L Street NW, 7th Floor
Washington, DC 20005
(202) 331-1010
devin.watkins@cei.org

Andrew M. Grossman
Kristin Shapiro
BAKER & HOSTETLER LLP
1050 Connecticut Ave., N.W.
Suite 1100
Washington, D.C. 20036
(202) 861-1697
agrossman@bakerlaw.com

Robert Alt
THE BUCKEYE INSTITUTE
88 East Broad Street
Suite 1300
Columbus, OH 43215
(614) 224-4422
robert@buckeyeinstitute.org

*Counsel for Plaintiffs-Appellees/Cross-Appellants*

**CERTIFICATE OF COMPLIANCE**

This motion complies with: (1) the type-volume limitation of Federal Rules of Appellate Procedure 27(d)(2)(A) because it contains 13,853 words, excluding the parts exempted by Rule 32(f); and (2) the typeface and type style requirements of Rule 27(d)(1)(E) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word (the program used for the word count).

/s/ *Devin Watkins*
Devin Watkins

**CERTIFICATE OF SERVICE**

I, Charles Devin Watkins, hereby certify that this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1.

/s/ *Devin Watkins*
Devin Watkins