# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 10, 2026

Lyle W. Cayce
Clerk

———————

No. 24-10760

———————

Scott McNutt,

*Plaintiff—Appellee*,

Rick Morris; Hobby Distillers Association; Thomas O. Cowdrey, III; John Prince, III,

*Plaintiffs—Appellees/Cross-Appellants*,

*versus*

US Department of Justice; Alcohol and Tobacco Tax and Trade Bureau, *a bureau of the U.S. Department of the Treasury*,

*Defendants—Appellants/Cross-Appellees*.

———————————————————————

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:23-CV-1221

———————————————————————

Before Jones and Graves, *Circuit Judges*, and Rodriguez, *District Judge*.[*]

Edith Hollan Jones, *Circuit Judge*:

———————————————

[*] District Judge for the Southern District of Texas, sitting by designation.

No. 24-10760

For more than 150 years, Congress has prohibited home distilleries as an adjunct to the law establishing a federal excise tax on distilled spirits. *See* Act of July 20, 1868, ch. 186, §§ 1–109, 15 Stat. 125, 125–168 (imposing excise taxes on distilled spirits and tobacco). In December 2023, a non-profit organization and several of its members challenged the law as unconstitutional.[1] The district court agreed with them. We concur that, while venerable, the statute violates the Constitution's Taxation and Necessary and Proper clauses. U.S. Const. art. I, § 8, cls. 1, 18. The district court's judgment and injunction are AFFIRMED in part and REVERSED in part.

## I. Background

Plaintiff Rick Morris is a connoisseur of bourbon whisky and a certified bourbon steward, certified because he mastered the art of tasting spirits and learned the science behind distilling and aging alcoholic spirits.

Morris wants to distill bourbon at home, where he has ample space in the backyard and side yard to engage in distilling "a safe distance from [his] house and other houses." As the owner and operator of a company that manufactures stills for the legally approved distillation and re-distillation of alcohol, he could easily undertake this venture. He would distill at home to experiment with bourbon recipes and try them out on his brother and friends.

Pursuing this passion, Morris founded the Hobby Distillers Association ("HDA"), a membership organization that "encourage[s] the legalization of at-home hobby distilling." The HDA claimed more than

_____

[1] About a month later, a different plaintiff filed a separate lawsuit in Ohio, challenging the exact statute at issue here. Complaint, *Ream v. DOT*, No. 2:24-CV-364 (S.D. Ohio Jan. 30, 2024), Dkt. No. 1. That case is currently pending before the Sixth Circuit. Notice of Appeal, *Ream v. DOT*, No. 25-3259, (6th Cir. Apr. 8, 2025), Dkt. No. 1.

1,300 members as of 2023, many of whom have donated time and money "to advance the cause of legalizing at-home distilling."

Plaintiff Scott McNutt is among the HDA's members who have expressed a desire to distill at home "for beverage purposes." Although he currently distills alcohol pursuant to a fuel-producer permit in a shed 261 feet away from his house, he wants to "tinker around" and create tastier distilled spirits that could potentially inspire a future business.

Plaintiff John Prince III also wants to distill spirits at home as a hobby. For years, he has (legally) produced homemade beer, wine, and other beverages, like hard cider, applejack, and sour-mash whiskey. To branch out into at-home distilling, he would only need to obtain a new condenser or a new still that could be set up in the garage attached to his house.

Likewise, Plaintiff Thomas O. Cowdrey III wants to distill alcohol at home as a hobby. Cowdrey learned about distilling through his friendship with Morris and through the Internet. He previously distilled alcohol for fuel in the garage near his house, but he wants to start at-home distilling to experiment with an apple-pie-vodka recipe he created.

But no one can legally distill consumable spirits at home. In 1868, a bill was enacted that generally imposed excise taxes on distilled spirits and tobacco. *See* Act of July 20, 1868, ch. 186, §§ 1–109, 15 Stat. 125, 125–168. Section 12 of the act did more than impose taxes; it prevented a person from using "any still, boiler, or other vessel for purpose of distilling" when the still was located, among other places, "in any dwelling-house" or "in any shed, yard, or enclosure connected with any dwelling-house." § 12, 15 Stat. at 130. Any violator could be fined and imprisoned. *Id.*

The law has been recodified but continues to provide that:

No distilled spirits plant for the production of distilled spirits shall be located in any dwelling house, in any shed, yard, or

3

> [e]nclosure connected with any dwelling house, or on board any vessel or boat, or on premises where beer or wine is made or produced, or liquors of any description are retailed, or on premises where any other business is carried on (except when authorized under subsection (b)).

26 U.S.C. § 5178(a)(1)(B). Any person who violates the law is subject to a fine of up to $10,000, up to 5 years imprisonment, or both. *Id.* § 5601(a)(6). In recent years, to administer and enforce the at-home distilling ban, some law-enforcement functions were moved from the Bureau of Alcohol, Tobacco and Firearms ("ATF") over to the U.S. Department of Justice ("DOJ") and to the newly created Alcohol and Tobacco Tax and Trade Bureau ("TTB") under the U.S. Department of the Treasury. *See* The Homeland Security Act of 2002, Pub. L. No. 107-296, § 111, 116 Stat. 2274, 2274–75 (2002).

McNutt is no stranger to the TTB. In fact, the TTB apparently believed that McNutt "may have purchased a still capable of producing alcohol and/or equipment and materials that may be used in the manufacture of a still." In 2014, the TTB sent him a "Notice of Potential Civil and Criminal Liability." McNutt was warned that "[f]ederal law provides no exemptions for the production of distilled spirits for personal or family use" at locations other than an authorized distilled-spirits plant. He was further advised that "[u]nlawful production of distilled spirits is a criminal offense, punishable by a fine of up to $500,000 [*sic*] and/or imprisonment for not more than 5 years." The TTB's letter attached a document reporting how it partners with state authorities in "targeting illegal possession of stills and illegal production of distilled spirits."

To question the home distilling ban and this kind of notice, Morris, McNutt, Prince, and Cowdrey had their lawyer telephone the TTB in November 2023 to ask whether they could acquire permits for home

distillation.  The TTB said no.  According to the TTB representative, the agency would not even consider a request for a permit to distill at home or in a residence because it is "against the law" and "illegal to distill spirits at a residence."  Although the TTB might consider issuing a distillery permit solely for fuel alcohol, the agency would not consider issuing a distilled spirits permit for personal consumption.

Shortly afterward, the individual plaintiffs and HDA sued the TTB and DOJ (collectively, "the government"), seeking injunctive and declaratory relief.  Their petition asserted that the prohibition and associated criminal provision violate the Constitution's Commerce, Taxation, and Necessary and Proper clauses.

After they moved for a preliminary injunction, the district court advanced the motion to a trial on the merits under FED. R. CIV. P. 65(a)(2).  Authoring a very thoughtful opinion, the district court dismissed Morris, Prince, and Cowdrey for lack of standing, but it granted relief to McNutt and HDA upon concluding that the relevant statutes, 26 U.S.C. §§ 5178(a)(1)(B) and 5601(6), violate all three constitutional provisions.  The court entered final judgment the day after its order.

The government has appealed, and Morris, Prince, and Cowdrey cross-appealed their dismissal for lack of standing.

## II. STANDARD OF REVIEW

"This court reviews questions of subject-matter jurisdiction de novo."  *Jones v. Reeves*, 121 F.4th 531, 534 (5th Cir. 2024) (italics omitted). The court also reviews "the grant of summary judgment de novo, the permanent injunction for abuse of discretion, and the legal issues underlying the grant of the injunction de novo."  *Med-Cert Home Care, LLC v. Becerra*, 19 F.4th 828, 830 (5th Cir. 2021) (italics omitted).

No. 24-10760

## III. ANALYSIS

We address in turn the issues of Article III standing and the statutes' constitutionality.

### A. Standing

A plaintiff satisfies the "irreducible constitutional minimum" for Article III standing by proving (1) an "injury in fact"; (2) a "causal connection between the injury and the conduct complained of"; and (3) a likelihood that a "favorable decision" will redress any injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 112 S. Ct. 2130, 2316 (1992). Because the TTB and DOJ challenge only the injury in fact prong on appeal, our analysis is confined to that element. Further, "standing is not dispensed in gross." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431, 141 S. Ct. 2190, 2208 (2021). HDA's claim of injury is addressed separately.

A plaintiff asserting an Article III injury "must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560, 112 S. Ct. at 2316). A plaintiff who challenges a statute "must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S. Ct. 2301, 2308 (1979) (citing *O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S. Ct. 669, 675 (1974)). But "an actual arrest, prosecution, or other enforcement action" is not required. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, 134 S. Ct. 2334, 2342 (2014). Instead, an official threat may satisfy the injury-in-fact element when (1) the plaintiff has "an intention to engage in a course of conduct arguably affected with a constitutional interest"; (2) that conduct is "proscribed by a

6

statute"; and (3) "a credible threat of prosecution" exists. *Id.* at 159, 134 S. Ct. at 2342 (quoting *Babbitt*, 442 U.S. at 298, 99 S. Ct. at 2309).

Each of the individuals here has satisfied these elements. First, each seriously intends to distill alcohol at or near his house or in his yard. They all declared under penalty of perjury that they would distill at home if they could. Their stated intentions are more than wishful thinking. Morris could easily start at-home distilling as the owner and operator of a company that manufactures stills for the distillation and re-distillation of fuel alcohol. McNutt has already been legally distilling fuel alcohol in a shed 261 feet away from his home, and the process for making distilled spirits is virtually the same. Prince only needs a new condenser or a new still to start distilling at home because he has already produced homemade beer, wine, and other beverages. And Cowdrey previously distilled alcohol for fuel purposes in the garage near his house and recently created an apple-pie-vodka recipe to distill at home.

Second, the individuals' serious intention to distill alcohol at home for beverage purposes is "proscribed by a statute." *Susan B. Anthony List*, 573 U.S. at 158, 134 S. Ct. at 2342. Because each individual intends to distill at a prohibited location, in or near their houses or on their property, they have shown an "intention to engage in a course of conduct *arguably* . . . proscribed by a statute."[2] *Susan B. Anthony List*, 573 U.S. at 158, 134 S. Ct. at 2342

---

[2] The government contends that this requirement is not met because the statute only prohibits distillation *in* the home rather than *at* home, and McNutt's declaration, for example, does not reference *in-home* distillation. This argument is inaccurate. Although the statute prohibits distillation "in any dwelling house," it also prohibits distillation in any "yard" or "shed." 26 U.S.C. § 5178(a)(1)(B). The term "yard" includes the "[i]nclo[s]ed ground adjoining to an hou[s]e." 2 S. Johnson, A Dictionary of the English Language (6th ed. 1785); 2 N. Webster, A Dictionary of the English Language (1828) ("An inclosure; usually, a small inclosed place in front of

(emphasis added).  Indeed, the Supreme Court has assured that "[n]othing in this Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law." *Id.* at 163, 134 S. Ct. at 2345 (citing *Babbitt*, 442 U.S. at 301, 99 S. Ct. at 2310).

Finally, each individual faces a credible threat of prosecution.  Shortly before filing this suit, a TTB employee informed the individuals' attorney that they could not acquire permits to distill at home because home distilling of consumable spirits is "against the law" and "illegal."[3]  Apart from this conversation, the TTB has a history of enforcing this prohibition, as evidenced by the pointed warning letter McNutt received in 2014 when the TTB apparently found out that McNutt "may have purchased a still capable of producing alcohol and/or equipment and materials that may be used in the manufacture of a still."  The letter and the conversation with the TTB indicate that all four plaintiffs face a credible threat of prosecution and the "realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt*, 442 U.S. at 298, 99 S. Ct. at 2308.  Given the "history of past enforcement," the individuals have provided "good evidence that the threat of enforcement is not 'chimerical.'" *Susan B. Anthony List*, 573 U.S. at 164, 134 S. Ct. at 2345 (some internal quotations omitted) (quoting *Steffel v. Thompson*, 415 U.S. 452, 459, 94 S. Ct. 1209,

---

or around a house or barn.").  The government's distinction between *in* home and *at* home contradicts the statute's plain text.

[3] Unsurprisingly, both the TTB's website and federal regulations confirm this stance. *See Home Distilling*, ALCOHOL AND TOBACCO TAX AND TRADE BUREAU, https://www.ttb.gov/distilled-spirits/penalties-for-illegal-distilling (last visited Dec. 5, 2025) (noting that "[f]ederal law strictly prohibits individuals from producing distilled spirits at home" and that "[p]roducing distilled spirits at any place other than a TTB-qualified distilled spirits plant can expose [the individual] to Federal charges for serious offenses"); 29 C.F.R. § 19.51 ("A person may not produce distilled spirits at home for personal use.").

1215–16 (1974)).  The credible threat here clearly falls within this court's recent precedent.  *See, e.g.*, *Texas v. Yellen*, 105 F.4th 755, 765 (5th Cir. 2024) (recognizing a substantial threat of enforcement when the pertinent statutory requirement was mandatory and demonstrated that the plaintiffs had "an actual and well-founded fear that the law will be enforced against them" (citations omitted)).  The individually named plaintiffs have standing to sue.

Separately, as an organization, the HDA can satisfy associational standing by proving three elements: (1) its members would "have standing to sue in their own right"; (2) HDA is trying to protect interests that "are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343, 97 S. Ct. 2434, 2441 (1977).  Here, the individual plaintiffs are members of HDA and have standing to sue in their own right.  HDA seeks to protect interests that are relevant to its organizational purpose—namely, "encourag[ing] the legalization of at-home hobby distilling" and "advanc[ing] the cause of legalizing at-home distilling."  Finally, neither HDA's constitutional claims nor its request for injunctive relief require individualized proof, rendering the participation of the HDA's members unnecessary.  The HDA has associational standing.

### B. 26 U.S.C. Section 5178(a)(1)(B)[4]

The government defends the statutory prohibition on at-home distillation of spirits as a "necessary and proper" exercise of Congress's power to "tax."[5]  We disagree.  First, contrary to the government's

---

[4] 26 U.S.C. § 5601(a)(6) enforces the statutory ban by creating criminal penalties. For convenience, the statutes are both signified by the prohibitory provision alone.

[5] The government does not challenge the district court's Commerce Clause analysis on appeal.  Accordingly, any such argument is forfeited, and we do not address it.

assumption, Section 5178 and Section 5601 are outside the scope of Congress's taxing power under the Constitution. Second, contrary to federalism principles, the statutory prohibition is not plainly adapted to executing Congress's taxing power and violates the Necessary and Proper Clause.

### 1. The Taxation Clause

Among Congress's enumerated powers is its authority to "lay and collect Taxes . . . to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. CONST. art. I, § 8, cl. 1. The parties do not dispute that Congress may impose a tax on distilled spirits, which attaches "as soon as [the spirit] is in existence." 26 U.S.C. § 5001(b). But Section 5178, quoted above, does not mention the tax or the means of its assessment. Instead, the provision prohibits the activity that would generate taxable spirits and, together with Section 5601, imposes criminal penalties. We return to fundamental principles to determine whether the taxation power extends to such a prohibition.

During the Founding era, to "lay" meant to "assess; to charge; to impose." 2 N. WEBSTER, A DICTIONARY OF THE ENGLISH LANGUAGE (1828) ("WEBSTER"). It also meant "[t]o charge as a payment." 2 S. JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (6th ed. 1785) ("JOHNSON"). To "collect" meant to "[t]o gather together; to bring into one place," 1 JOHNSON, or to "gather money or revenue from debtors; to demand and receive," 1 WEBSTER. And a "tax" meant "[a] rate or sum of money assessed on the person or property of a citizen by government, for the use of the nation or state." 2 WEBSTER;

---

*See* FED. R. APP. P. 28(a)(8); *Boone v. Rankin Cnty. Pub. Sch. Dist.*, 140 F.4th 697, 711 (5th Cir. 2025).

No. 24-10760

*see also* 2 Johnson (defining it as "[a]n impost" or "a tribute imposed"). Together, these definitions confirm the obvious: the power to "lay and collect Taxes" means Congress can charge or demand money from taxpayers.

It is also obvious that the purpose of a tax is to raise revenue for the government.[6] Indeed, "the *essential* feature of any tax" is that "[i]t produces at least some revenue for the Government." *NFIB v. Sebelius*, 567 U.S. 519, 564, 132 S. Ct. 2566, 2594 (2012) (emphasis added); *see also United States v. Butler*, 297 U.S. 1, 61, 56 S. Ct. 312, 317 (1936) ("A tax, in the general understanding of the term, and as used in the Constitution, signifies an exaction *for the support of the government*." (emphasis added)); 2 Webster (defining a "tax" as "[a] rate or sum of money assessed on the person or property of a citizen by government, *for the use of the nation or state*." (emphasis added)). And Congress has the power to tax activity that it cannot directly regulate. *See License Tax Cases*, 72 U.S. (5 Wall.) 462, 471 (1867); *NFIB*, 567 U.S. at 537, 132 S. Ct. at 2579; *cf. Foreman v. United States*, 255 F. 621, 623 (4th Cir. 1918) (upholding regulations that affected the revenue, even though their effect was "only remote and incidental" and "tend[ed] to promote public health and morals and doubtless that consideration influenced its enactment").

Moreover, "'[e]very tax is in some measure regulatory.'" *NFIB*, 567 U.S. at 567, 132 S. Ct. at 2596 (quoting *Sonzinsky v. United States*, 300 U.S.

---

[6] *See* 1 The Political Writings of John Dickinson 179 (1801) ("A '*tax*' mean[t] an imposition to raise money." (emphasis in original)); *id.* at 174 ("To the word '*tax*,' I annex that meaning which the constitution and history of *England* require to be annexed to it; that is—that it is *an imposition on the subject, for the sole purpose of levying money*." (emphasis in original)); 1 Journals of the Continental Congress 1774–1789, at 84 (Worthington C. Ford ed., 1904) (stating that Britain's taxes and impositions under the Stamp Act were "for the express purpose of raising a [r]evenue").

506, 513, 57 S. Ct. 554, 555 (1937)).  But while "a tax is not any the less a tax because it has a regulatory effect," *Sonzinsky*, 300 U.S. at 513, 57 S. Ct. at 555–56, "Congress's ability to use its taxing power to influence conduct is not without limits," *NFIB*, 567 U.S. at 572, 132 S. Ct. at 2599.  The Court emphasized in *NFIB* that "the power to tax is not the power to destroy while this Court sits." *Id.* at 573, 132 S. Ct. at 2600 (internal quotations omitted).  Consequently, "Congress's authority under the taxing power is limited to requiring an individual to pay money into the Federal Treasury, *no more.*" *Id.* at 574, 132 S. Ct. at 2600 (emphasis added).  In fact, "[i]f a tax is properly paid, the Government has *no* power to compel or punish individuals subject to it." *Id.* (emphasis added).  Or as the Court noted nearly a century ago, "[i]t is not contended that [the taxing] provision grants power to regulate agricultural production on the theory that such legislation would promote the general welfare." *Butler*, 297 U.S. at 64, 56 S. Ct. at 318.

Section 5178(a)(1)(B) and Section 5601(a)(6) exceed these constitutional limits.  Primarily, neither provision raises revenue.  Not only do they prohibit at-home distilleries, but in so doing, they amount to an anti-revenue provision that prevents distilled spirits from coming into existence. *Cf.* 26 U.S.C. § 5001(b) (taxation begins "as soon as [the spirit] is in existence").  The provisions operate to *reduce* revenue instead of raising it.  This violates the Supreme Court's explanation of how the federal power of taxation works: "[I]mposition of a tax nonetheless leaves an individual with *a lawful choice* to do or not do a certain act, so long as he is willing to pay a tax levied on that choice." *NFIB*, 567 U.S. at 574, 132 S. Ct. at 2600 (emphasis added).  These plaintiffs have only the choice *not* to do as they wish or risk fines and imprisonment.[7]

---

[7] This purely regulatory set of options is analogous to the Court's description of Congress's power under the Commerce Clause, which confers broader ability to control

The government contends that this prohibition was enacted to prevent tax evasion because "[a] distiller can more easily conceal a spirit's strength (and thus avoid the proper tax rate)—or conceal a distilling operation altogether—if his still is in his house or connected with it."[8] But just as "Congress cannot authorize a trade or business within a State in order to tax it," it stands to reason that Congress cannot prohibit intrastate activity solely because it might produce products hard to tax.[9] *License Tax Cases*, 72 U.S. (5 Wall.) at 471. Congress's taxing power "reaches only existing subjects," not activity that may generate subjects of taxation. *Id.* Put otherwise, preventing activity lest it give rise to tax evasion places no limit whatsoever on Congress's power under the taxation clause. In contrast, all of the other statutory provisions governing the manufacture, bottling, and labelling of distilled spirits exist to facilitate collection of taxes associated with the activity, not to prevent spirits from being distilled in the first place. Section 5178(a)(1)(B) and Section 5601(a)(6) do not represent an exercise of the taxation power of Congress.

---

individual behavior than does the power of taxation. *See id.* at 572–73, 132 S. Ct. at 2599–600.

[8] *See* H.R. Rep. No. 39-24, at 1 (1867) ("[I]n the manufacture and sale of . . . spirits, . . . the most stupendous frauds are practiced against the government in the collection of its revenue. Indeed, it is believed that at least seven-eighths of the entire amount of spirits manufactured under the present law have escaped taxation.").

[9] The government now contends that "[t]he location restriction does not ban plaintiffs from distilling . . . at home"—it simply limits where *on an individual's property* he may place his still, thus only "regulat[ing] the manner in which the plaintiffs go about that taxable activity." As discussed above, however, the statute not only prohibits distillation "in any dwelling house" but also in any "yard" or "shed." 26 U.S.C. § 5178(a)(1)(B). Contrary to the government, by its terms, the statute prohibits distillation anywhere on one's property.

## 2. The Necessary and Proper Clause

The government's primary defense of the home distilling ban rests on the Necessary and Proper Clause. That clause has been characterized as the "last, best hope of those who defend ultra vires congressional action." *Printz v. United States*, 521 U.S. 898, 923, 117 S. Ct. 2365, 2378–79 (1997). Congress is empowered to "make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. CONST. art. I, § 8, cl. 18. To satisfy the clause, a law must "carry[] into Execution" some other enumerated power. In general, the Necessary and Proper Clause "gives Congress power to pass laws both 'vertically' to implement its own enumerated powers and 'horizontally' to implement the constitutionally vested powers of federal executive and judicial officers." Gary Lawson & Patricia B. Granger, *The "Proper" Scope of Federal Power: A Jurisdictional Interpretation of the Sweeping Clause*, 43 DUKE L.J. 267, 274 n.23 (1993).

Chief Justice Roberts stated, "We have long read this provision to give Congress great latitude in exercising its powers." *NFIB*, 567 U.S. at 537, 132 S. Ct. at 2579. He reinforced the need for deference by quoting *McCulloch*'s famous statement: "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421 (1819). Nonetheless, the Necessary and Proper Clause "does not license the exercise of any 'great substantive and independent power[s]' beyond those specifically enumerated." *NFIB*, 567 U.S. at 559, 132 S. Ct. at 2591. And the Court cautioned, "[o]ur respect for Congress's policy judgments thus can never extend so far as to disavow restraints on

14

No. 24-10760

federal power that the Constitution carefully constructed." *Id.* at 537, 132 S. Ct. at 2579.

The Framers insisted that this clause grants no new power to Congress.[10] Moreover, by its own terms, "even where a law is necessary," "it may still be 'improper.'" *Hobby Distillers Ass'n v. Alcohol & Tobacco Tax & Trade Bureau*, 740 F. Supp. 3d 509, 526 (N.D. Tex. 2024). The issue thus becomes whether Section 5178 and Section 5601 are both "necessary" and

---

[10] *See* 2 DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 468 (Jonathan Elliot ed., 2d ed. 1836) ("ELLIOT'S DEBATES") (James Wilson stating that the Necessary and Proper Clause "is saying no more than that the powers we have already particularly given, shall be effectually carried into execution," and that it "gives more or other powers; nor does it, in any degree, go beyond the particular enumeration" because Congress's power under this clause "is limited and defined by the following, 'for carrying into execution the foregoing powers'"); 3 ELLIOT'S DEBATES, at 441 (Edmund Pendleton stating that the Necessary and Proper Clause does "not go[] a single step beyond the delegated powers," and if Congress wanted to pass a law under this clause, "they must pursue some of the delegated powers, but can by no means depart from them, or arrogate any new powers; for the plain language of the clause is, to give them power to pass laws in order to give effect to the delegated powers"); 3 ELLIOT'S DEBATES, at 455 (James Madison explaining that the clause "only extended to the enumerated powers," and "[s]hould Congress attempt to extend it to any power not enumerated, it would not be warranted by the clause" because "it was a restraint on the exercise of a power expressly delegated to Congress"); 4 ELLIOT'S DEBATES, at 141 (Archibald Maclaine stating that "Congress can have no power but what we expressly give them"; that the Necessary and Proper Clause "gives no new power, but declares that those already given are to be executed by proper laws"; and that Congress "can make no laws to execute any other power" because the clause "specifies that they shall make laws to carry into execution *all the powers vested* by this Constitution" (emphasis in original)); 1 ANNALS OF CONG. 277 (Joseph Gales ed., 1789) (Elbridge Gerry stating that the clause "gives no legislative authority to Congress to carry into effect any power not expressly vested by the constitution"); 3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION 267 (1833) (the clause "neither enlarges any power specifically granted; nor is it a grant of any new power to congress" but "is merely a declaration for the removal of all uncertainty, that the means of carrying into execution those, otherwise granted, are included in the grant").

"proper" in relation to the assessment and collection of federal taxes on distilled spirits.

### a. Necessary

Dictionaries published at the time of the Founding defined "necessary" to mean "indispensably requisite;" "indispensable; requisite, essential;" or "[u]navoidable." 2 WEBSTER; *see also* 2 JOHNSON (defining "necessary" as "[n]eedful" or "indispensably requisite"). Early in our history, however, defining "necessary" to encompass "indispensable" arguably revealed some tension in the text of the Constitution. Several clauses use the word "necessary" in slightly different senses.[11] In *McCulloch*, Chief Justice Marshall recognized that "necessary" was defined as "indisputably requisite," but he resolved the incongruities in the constitutional text by holding that "necessary" does not always mean "indispensable" and may instead connote "one thing [that] is convenient, or useful, or essential to another." 17 U.S. (4 Wheat.) at 367, 413–14. The Court concluded that to be "necessary," a law must be "plainly adapted" to an enumerated power. *Id.* at 421. This description has prevailed since then. *See NFIB*, 567 U.S. at 537, 132 S. Ct. at 2579 (quoting *McCulloch*, 17 U.S. (4 Wheat.) at 421); *Jinks v. Richland County*, 538 U.S. 456, 462, 464, 23 S. Ct. 1667, 1671 (2003) (recognizing the "plainly adapted" standard as the proper test); *United States v. Comstock*, 560 U.S. 126, 134, 130 S. Ct. 1949, 1956 (2010) (same); *James Everard's Breweries v. Day*, 265 U.S. 545, 558–59, 44 S. Ct. 628, 631 (1924)("[i]t has long been settled that Congress . . . may adopt any means, appearing to it most eligible and appropriate, which are

---

[11] *Compare* U.S. CONST. art. I, § 10, cl. 2 (states limited to imposing duties "absolutely necessary" for inspection laws), and art. II, § 3 (President's State of the Union message to contain "necessary and expedient" information), *with* art. I, § 8, cl. 18 (the Necessary and Proper Clause enabling Congress to effectuate enumerated powers).

*adapted* to the end to be accomplished and consistent with the letter and spirit of the Constitution" (emphasis added)).

Judged by the *McCulloch* standard,[12] prohibiting at-home distilleries is not "plainly adapted" to effectuate Congress's taxation of spirits. The provisions challenged here do not tax the distilled spirits or the still; they flatly prohibit and penalize distillation inside a home or in any yard or shed connected to a home. *See* 26 U.S.C. §§ 5178(a)(1)(B), 5601(a)(6).[13] Because these provisions tax nothing, and are distinct from the regulation of distilling alcoholic products that is permitted by federal tax law, they do not help Congress raise revenue. On the contrary, the statutes reduce revenue by preventing individuals from making distilled spirits. The district court correctly explained that "the provisions at issue punish individuals Congress cannot reach," *Hobby Distillers Ass'n*, 740 F. Supp. 3d at 529, and this is because it criminalizes the conduct of a person in order to prevent its taxation power from taking effect. Section 5178 has no "real or substantial relation to the enforcement of" the taxing power. *James Everard's Breweries*, 265 U.S. at 560, 44 S. Ct. at 632.

Pointing to the legislative justification for the 1868 enactment of what became Section 5178(b)(1)(A), the government cites then-rampant evasion of the spirits tax and the perceived need to curb abuse by regulating the

---

[12] We do not read *Comstock* as modifying *McCulloch* to import some kind of rational basis test into the Necessary and Proper Clause. Instead, the Court's discussion about the "necessity" of providing long-term confinement for certain incurable prisoners demonstrated a clear chain of causation from Congress's power, derived from its enumerated powers, to prescribe crimes and imprisonment. As noted, *Comstock* expressly relied on the *McCulloch* formulation. *See* 560 U.S. at 134, 130 S. Ct. at 1956. In any event, *NFIB*'s description of the Necessary and Proper Clause in relation to the taxing power is directly on point in this case.

[13] In fact, a separate provision criminalizes the mere possession by individuals of distillation equipment for use at their homes. *See* 26 U.S.C. § 5601(a).

location of distilleries.[14]   Accordingly, separate paragraphs within Section 5178 as a whole authorize the Treasury Secretary to license distilleries and prohibit their location, without express approval, where any other business is carried on.  *See* 26 U.S.C. § 5178(a)(1)(A), (C), (b).  Together with these provisions, an "elaborate system has been set up by legislation and regulations thereunder to protect the revenue on distilled spirits."  *United States v. Goldberg*, 225 F.2d 180, 187 (8th Cir. 1955).  But instead of demonstrating how the at-home distillery prohibition is "plainly adapted" to protect the federal revenue stream, the regulations repudiate the government's position.

First, licensing and regulating distilleries accomplish the purposes of taxation because they allow spirits to be created.  The regulations authorize a person to conduct distilling so long as he is willing to pay a tax.  *Cf. NFIB*, 567 U.S. at 574 132 S. Ct. at 2600 ("imposition of a tax nonetheless leaves an individual with a lawful choice to do or not do a certain act, so long as he is willing to pay a tax levied on that choice").  Section 5178, in contrast to regulating the creation and distribution of distilled spirits, is a pure prohibition of conduct that might otherwise have generated taxable products.

Second, licensing at-home distilling would subject the plaintiffs, or any individuals, to the same regulatory regime that covers licensed distillers.[15]  Thus, plaintiffs' failures to obtain a license or comply with the

---

[14] *See* H.R. Rep. No. 39-24, at 1 (1867) ("[I]n the manufacture and sale of . . . spirits, . . . the most stupendous frauds are practiced against the government in the collection of its revenue.").

[15] Indeed, the TTB might resurrect a proposal that Congress considered before it adopted the ban on at-home distilling: tax "the capacity of the distillery," a "simple, easy, and effective" method that would "greatly . . . reduce the expense of collection" and "avoid all the various temptations and opportunities for fraud."  *See* H.R. Rep. No. 39-24, at 5 (1867).

regulations or pay the spirits tax would be sanctionable, just as such noncompliance or evasion by currently licensed distillers is punishable. Excising the Section 5178 prohibition and the accompanying Section 5601 penalty would place at-home distilleries on the same level as current licensees. And it goes without saying that the economics and practicality of at-home distilling today are much different than they were in the nineteenth century, and so is the government's ability to investigate such activity. In sum, the challenged provisions do nothing to further tax collection; they only inhibit revenue raising.

Significantly, the Supreme Court long ago rejected Congress's attempt to ban one product in order to further taxation of another product. *See United States v. Dewitt*, 76 U.S. (9 Wall.) 41 (1869). There, the challenged statute prohibited the sale of naphtha mixed with illuminating oils. *Id.* at 44. The government attempted unsuccessfully to defend the statute's constitutionality under the Commerce Clause and taxing power. As to the latter, it argued, the prohibition "was in aid and support of the internal revenue tax imposed on other illuminating oils." *Id.* The Court rejected the government's justifications as "too remote and too uncertain" to conclude that "the prohibition [wa]s an appropriate and plainly adapted" execution of the taxing power. *Id.* Further, "[i]f the prohibition . . . has any relation to taxation at all, it is merely that of increasing the production and sale of other oils, and, consequently, the revenue derived from them, by excluding from the market the particular kind described." *Id.* While the government proposed analogies to various distilled-spirits regulations, the Court noted that those regulations were "restricted to the very articles which are the subject of taxation," but "in the case before [the Court], *no tax is imposed on the oils . . . .*" *Id.* (emphasis added). Therefore, the Court held that this prohibition was a "police regulation"—reserved to the states—and unconstitutional as a federal measure. *Id.* at 45.

Similarly, the government's citation of cases that are "restricted to the very articles which are the subject of taxation" are inapposite to Section 5178's prohibition of conduct in order to prevent taxable activity. In *Felsenheld v. United States*, the Court upheld a federal law that prohibited inserting coupons or other "prize[s]" in tobacco packages. *See* 186 U.S. 126, 127, 130–35, 22 S. Ct. 740, 741–43 (1902). Congress had not abused its power under the Taxation Clause, the Court concluded, because "for the manufacture and handling of goods which are subjected to an internal revenue tax," "it is a perfectly reasonable requirement that every package of such goods should contain nothing but the article which is taxed . . . ." *Id.* at 132, 22 S. Ct. at 742–43. And in *Stilinovic v. United States*, the court upheld the constitutionality of a law that prohibits sellers of distilled spirits from "plac[ing] in any liquor bottle any distilled spirits whatsoever other than those contained in such bottle at the time of stamping[.]" 336 F.2d 862, 863–65 (8th Cir. 1964) (quoting 26 U.S.C. § 5301(c)); *see also Goldberg*, 225 F.2d at 188 (upholding a similar regulation as "reasonably related to the protection of the revenue"). Such measures facilitate the measurement and integrity of the taxable products and clearly relate to tax collection. These cases thus concern "the very articles" subject to taxation, not those, as in this case, on which "no tax is imposed." *See Dewitt*, 76 U.S. (9 Wall.) at 44.

### b. Proper

Among other definitions in dictionaries of the Founding era, "proper" meant "particularly suited to" or "correct" or "just," 2 WEBSTER, and it represented something that was "[n]atural" or "original" or even "[f]it; accommodated; adapted; suitable; qualified," 2 JOHNSON.

At the Founding, the term "proper" was frequently used when individuals were discussing "the allocation of governmental powers" or the separation of powers. Lawson & Granger, *supra*, at 291; *see also* Randy E.

Barnett, *The Original Meaning of the Necessary and Proper Clause*, 6 U. PA. J. CONST. L. 183, 217 (2003) (stating that a law's propriety may be determined "(1) according to principles of separation of powers, (2) according to principles of federalism, and (3) according to the background rights retained by the people.").

Indeed, writing as Publius, Alexander Hamilton explained that "[t]he propriety of a law, in a constitutional light, must always be determined by the nature of the powers upon which it is founded." THE FEDERALIST NO. 33, at 206 (J. Cooke ed. 1961). Accordingly, when "acts of the larger society . . . are not pursuant to its constitutional powers . . . [and] are invasions of the residuary authorities of the smaller societies," then these actions "will be merely acts of usurpation and will deserve to be treated as such." *Id.* at 207. Consistent with this understanding, *McCulloch* characterized a law as "proper" when it is "not prohibited" by another enumerated powers and is "consist[ent] with the letter and spirit of the constitution." *McCulloch*, 17 U.S. (4 Wheat.) at 421. A law must be declared unconstitutional if Congress "adopt[ed] measures which are prohibited by the constitution" or "pass[ed] laws for the accomplishment of objects not [e]ntrusted to the government" and "under the pretext of executing its powers." *Id.* at 423. Relatedly, a law that exceeded Congress's powers would expand the federal government and necessarily infringe on state sovereignty. *Printz*, 521 U.S. at 923–24, 117 S. Ct. at 2379.[16] By purporting

---

[16] "[T]he Constitution established a system of 'dual sovereignty.'" *Id.* at 918, 117 S. Ct. at 2376 (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 457, 111 S. Ct. 2395, 2399 (1991)). On one hand, it created "a Federal Government of enumerated powers." *United States v. Lopez*, 514 U.S. 549, 552, 115 S. Ct. 1624, 1626 (1995) (citing U.S. CONST. art. I, § 8). But on the other, the state governments' powers are "numerous and indefinite." THE FEDERALIST NO. 45, at 313 (J. Cooke ed.). Because of these principles, Congress lacks "a plenary police power that would authorize enactment of every type of legislation." *Lopez*, 514 U.S. at 566, 115 S. Ct. at 1633.

to ban activity without a plain connection to the exercise of Congress's taxation power, Congress has essentially—and "improperly"—invaded the reserved police and regulatory power of the states.

We agree with Plaintiffs that Sections 5178(a)(1)(B) and 5601(a)(6)'s banning and criminalization of at-home distilling "is not a proper means of exercising the tax power" because it "takes away Plaintiffs' choice to pay the tax" by engaging in otherwise legal, albeit licensed and regulated, activity. Indeed, by "claim[ing] the authority to ban [the imposition of] a tax liability out of fear of future tax avoidance," the government "invites a question: what cannot be banned?" Under the government's logic, Congress may criminalize nearly any at-home conduct only because it has the possibility of concealing taxable activity. Home-based businesses may be forbidden. Remote work may be deemed a crime. But "the taxing power does not give Congress the same degree of control over individual behavior [as the Commerce Clause]." *NFIB*, 567 U.S. at 573, 132 S. Ct. at 2600. Logically, the Necessary and Proper Clause cannot expand the reach of the taxing power to criminalize conduct that could produce taxable revenue under the pretext that generating revenue for the federal government will be enhanced.

Without any limiting principle, the government's theory would violate this court's obligation to read the Constitution "carefully to avoid creating a general federal authority akin to the police power." *Id.* at 536, 132 S. Ct. at 2578. As a result, Sections 5178(a)(1)(B) and 5601(a)(6) are not "proper" within the meaning of the Necessary and Proper Clause.

## IV. Conclusion

The statutory prohibitions on in-home distilling are neither "plainly adapted" to Congress's taxing power nor "consist[ent] with the letter and spirit" of the Constitution. *See McCulloch*, 17 U.S. (4 Wheat.) at 421. The district court correctly determined that these statutes here violate the

No. 24-10760

Taxation and Necessary and Proper clauses. Because we have concluded that all plaintiffs have Article III standing to challenge these provisions, we AFFIRM as MODIFIED the district court's judgment and injunction[17] against their enforcement.

---

[17] Generally, for a permanent injunction, a plaintiff must establish that (1) he or she suffered an irreparable injury; (2) the remedies available at law are inadequate; (3) the balance of hardships between the plaintiff and defendant warrants a remedy in equity; and (4) a permanent injunction would not disserve the public interest. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391, 126 S. Ct. 1837, 1839 (2006). On appeal, the government makes no arguments on the district court's permanent-injunction analysis of these four factors. Accordingly, any such argument is forfeited. *See* FED. R. APP. P. 28(a)(8); *Boone*, 140 F.4th at 711.