**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

SCOTT MCNUTT,

Plaintiff-Appellee,

RICK MORRIS; HOBBY DISTILLERS ASSOCIATION; THOMAS O. COWDREY, III; JOHN PRINCE, III,

Plaintiffs-Appellees/Cross-Appellants,

v.

US DEPARTMENT OF JUSTICE; ALCOHOL AND TOBACCO TAX AND TRADE BUREAU, A BUREAU OF THE U.S. DEPARTMENT OF THE TREASURY,

Defendants-Appellants/Cross-Appellees.

On Appeal from the United States District Court
for the Northern District of Texas

**PETITION FOR REHEARING EN BANC BY DEFENDANTS-APPELLANTS U.S. DEPARTMENT OF JUSTICE AND ALCOHOL AND TOBACCO TAX AND TRADE BUREAU**

BRETT A. SHUMATE
  *Assistant Attorney General*

RYAN RAYBOULD
  *United States Attorney*

AUGUST E. FLENTJE
CAROLINE W. TAN
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7236*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-4171*

# CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as defendants-appellants/cross-appellees are all governmental parties.

*/s/ Caroline Tan*
Caroline W. Tan

For over 150 years, Congress has imposed an excise tax on distilled spirits and regulated the manner of their production. As part of that comprehensive scheme, Congress placed certain restrictions on where a distilled spirits plant may be located. Enacted in response to widespread evasion of the distilled-spirits tax at the covered places, the location restrictions state, in relevant part, that a distilled spirits plant may not be located "in any dwelling house," "in any shed, yard, or inclosure connected with any dwelling house," "on board any vessel or boat," or "on premises where beer or wine is made or produced, or liquors of any description are retailed." 26 U.S.C. § 5178(a)(1)(B). A person who "uses, or possesses with intent to use, any still . . . for the purpose of producing distilled spirits" in a prohibited location is subject to criminal penalties. *Id.* § 5601(a)(6).

The panel held that the location restrictions exceed Congress's authority to take steps necessary and proper to its taxing power. Less than two weeks later, a majority of the Sixth Circuit reached the opposite conclusion in a parallel challenge to the same provisions. *See Ream v. U.S. Dep't of the Treasury*, No. 25-3259, 2026 WL 1078212 (6th Cir. Apr. 21, 2026). Writing for the majority, Judge Kethledge upheld the location restrictions as a "necessary

and proper means of collecting the federal excise tax on distilled spirits" because they facilitate the government's efforts to inspect distilling operations and prevent efforts to elude federal taxes. *Id.* at \*1, \*4. Judge Mathis believed the plaintiff lacked standing and would not have reached the merits.

The panel's opinion directly conflicts with the Sixth Circuit's decision. The panel believed that the location restrictions exceed Congress's necessary-and-proper authority because they prevent some people who want to distill from paying the tax and doing so. *See* Op. 17. But as Judge Kethledge explained, "Congress can take account of causal chains longer than that." *Ream*, 2026 WL 1078212, at \*5. Congress could easily conclude, for example, that the location restrictions would have the net effect of raising revenue by motivating at least some would-be home distillers to set up their operations in bonded premises more easily subject to federal inspection and tax collection. Similarly, Congress could easily conclude that the challenged law would "shift[] consumption" from untaxed spirits produced at home to taxed spirits produced in distilleries. *Id.* Congress likewise had "ample reason" to conclude that "for every at-home distiller who pays the tax, many others would not." *Id.* Indeed, the historical record demonstrates that Congress passed these restrictions in direct response to "rampant" evasion of the distilled-spirits tax

"for literally all of the nation's history." *Id.* at *4. And, as the Sixth Circuit recognized, nothing has fundamentally changed about the legal or practical difficulties in inspecting distilling operations located inside a house or other prohibited location. *Id.* at *5.

The panel's opinion "conflicts with an authoritative decision of another United States court of appeals" regarding the constitutionality of a longstanding Act of Congress. Fed. R. App. P. 40(b)(2)(C). Rehearing by the full Court is warranted.

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND RULE 40 STATEMENT ............................................ ii

TABLE OF AUTHORITIES ..................................................................... vi

STATEMENT OF THE ISSUE ................................................................. 1

STATEMENT OF THE COURSE OF PROCEEDINGS AND
    DISPOSITION OF THE CASE ......................................................... 1

STATEMENT OF THE FACTS ................................................................ 1

REASONS FOR GRANTING THE PETITION ........................................... 6

CONCLUSION .....................................................................................16

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

PANEL OPINION

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Felsenheld v. United States,*
  186 U.S. 126 (1902) ................................................................. 7

*Hobby Distillers Ass'n v. Alcohol & Tobacco Tax & Trade Bureau,*
  740 F. Supp. 3d. 509 (N.D. Tex. 2024) .......................... 13

*Jinks v. Richland Cnty.,*
  538 U.S. 456 (2003) ............................................................... 15

*McCulloch v. Maryland,*
  17 U.S. (4 Wheat.) 316 (1819) ................................... 6, 7, 15

*National Fed'n of Indep. Bus. v. Sebelius,*
  567 U.S. 519 (2012) .............................................................. 7

*Ream v. U.S. Dep't of the Treasury,* No. 25-3259,
  2026 WL 1078212 (6th Cir. Apr. 21, 2026) ................ 5, 6, 8, 10, 11, 12, 14, 15

*United States v. Comstock,*
  560 U.S. 126 (2010) ......................................................... 6, 7, 14

*United States v. Goldberg,*
  225 F.2d 180 (8th Cir. 1955) ................................................ 3

*United States v. Ulrici,*
  111 U.S. 38 (1884) ........................................................... 8

**U.S. Constitution:**

Art. I:
  § 8, cl. 1 ........................................................................... 6
  § 8, cl. 18 .......................................................................... 6

**Statutes:**

Act of July 20, 1868, ch. 186, 15 Stat. 125 ....................................................................

§ 5, 15 Stat. at 126 ..................................................................... 3

§ 6, 15 Stat. at 126 ..................................................................... 8

§ 9, 15 Stat. at 128 ..................................................................... 8

§ 12, 15 Stat. at 130 ............................................................... 2, 8

§ 14, 15 Stat. at 130 .................................................................. 3

§ 15, 15 Stat. at 130 .................................................................. 3

26 U.S.C. § 5001(a)(1) ............................................................ 1, 7

26 U.S.C. § 5001(b) ................................................................. 1, 7

26 U.S.C. § 5002(a)(10)-(11) .................................................. 1, 7

26 U.S.C. § 5042(a)(2) ................................................................ 1

26 U.S.C. § 5053(e) .................................................................... 1

26 U.S.C. § 5171(c) ..................................................................... 3

26 U.S.C. § 5171(d)(1) ............................................................ 3, 13

26 U.S.C. § 5178 ........................................................................ 8

26 U.S.C. § 5178(a)(1)(A) ................................................. 2, 3, 9, 15

26 U.S.C. § 5178(a)(1)(B) ................................................... 2, 9, 15

26 U.S.C. § 5178(a)(1)(C) ................................................... 2, 9, 15

26 U.S.C. § 5178(a)(2)(B)-(C) ...................................................... 3

26 U.S.C. § 5178(a)(2)(C)(ii) ....................................................... 3

26 U.S.C. § 5178(b) ........................................................... 2, 9, 15

26 U.S.C. § 5179 ......................................................................... 3

26 U.S.C. § 5203(a) ................................................................ 4

26 U.S.C. § 5203(b) ........................................................... 3, 8

26 U.S.C. § 5601(a)(6) ............................................................ 2

27 U.S.C. § 203 ............................................................ 3, 12, 13

27 U.S.C. § 204 ............................................................ 3, 12, 13

**Rule:**

Fed. R. App. P. 40(b)(2)(C) ...................................................15

**Legislative Materials:**

Cong. Globe, 39th Cong., 1st Sess. 2839 (1866) .............................. 2, 8

H.R. Rep. No 39-24 (1867) ...................................................... 2, 8, 11

**Other Authorities:**

Alcohol & Tobacco Tax & Trade Bureau:
   *Annual Financial Report, Fiscal Year 2025,*
   https://perma.cc/8HFN-ESP5 ...................................................... 12
   *Statistical Release, Tax Collections* (2026),
   https://perma.cc/8DHE-UGQT ...................................................... 11

**STATEMENT OF THE ISSUE**

Whether the panel erred in concluding, in conflict with the Sixth Circuit, that the location restrictions are not a necessary and proper means of collecting the federal excise tax on distilled spirits.

**STATEMENT OF THE COURSE OF PROCEEDINGS AND DISPOSITION OF THE CASE**

As relevant here, the panel held that the location restrictions exceed Congress's enumerated powers. That decision directly conflicts with the Sixth Circuit. Further procedural history is provided below in the Statement of the Facts.

**STATEMENT OF THE FACTS**

**1.** For more than a century, Congress has taxed the distillation of spirits. The tax attaches as soon as the spirits are "in existence," 26 U.S.C. § 5001(b), and the tax is assessed based on the spirit's "proof" (*i.e.*, alcohol by volume). The higher a spirit's alcohol content, the higher its tax rate. *See id.* §§ 5001(a)(1), 5002(a)(10)–(11).[1]

In 1868, after observing "great frauds" being perpetrated "daily" against the "collection of the internal revenue on distilled spirits," Congress

---

[1] Beer and wine produced solely for personal use is generally exempt from the excise tax. 26 U.S.C. §§ 5042(a)(2), 5053(e).

passed restrictions limiting the use of stills for the distillation of spirits in certain locations associated with tax evasion. H.R. Rep. No. 39-24, at 1–2 (1867); Cong. Globe, 39th Cong., 1st Sess. 2839, 2841 (1866); Act of July 20, 1868, ch. 186, § 12, 15 Stat. 125, 130.

As codified today, the location restrictions provide that a distilled spirits plant may not be located: (1) "in any dwelling house," (2) "in any shed, yard, or inclosure connected with any dwelling house," (3) "on board any vessel or boat," (4) "on premises where beer or wine is made or produced, or liquors of any description are retailed," or (5) "on premises where any other business is carried on" subject to certain exceptions linked to "jeopardiz[ing] the revenue." 26 U.S.C. § 5178(a)(1)(B), (b). These location restrictions are bookended by two provisions authorizing the Secretary to take certain steps regarding the "location" and "construction" of distilled spirits plants as the Secretary deems necessary to facilitate inspection and "afford adequate security to the revenue." *Id.* § 5178(a)(1)(A), (C). Any person who "uses, or possesses with intent to use, any still, boiler, or other utensil for the purpose of producing distilled spirits" in a prohibited location is subject to a fine of up to $10,000, imprisonment of up to five years, or both. *Id.* § 5601(a)(6).

The location restrictions are one part of the "elaborate system [that] has been set up by legislation and regulations thereunder to protect the revenue on distilled spirits," *United States v. Goldberg*, 225 F.2d 180, 187 (8th Cir. 1955), many components of which were first enacted at the same time as the location restrictions discussed above, *see, e.g.*, Act of July 20, 1868, ch. 186, §§ 5, 14, 15 Stat. at 126, 130–31. Congress has also, for example, required distilling systems to be constructed "to prevent the unauthorized removal of distilled spirits" before the tax is calculated, and to be secured "to facilitate inspection and afford adequate security to the revenue." 26 U.S.C. § 5178(a)(2)(B)–(C); *see id.* § 5178(a)(1)(A), (2)(C)(ii) (permitting the Secretary to "order and require" fastenings, locks, and seals as necessary to secure the revenue). Distillers must register their stills and distilled spirits plants, *id.* §§ 5171(c), 5179, as well as apply for and obtain a distilling permit from the government, *id.* § 5171(d)(1); 27 U.S.C. §§ 203–204; *see also* Act of July 20, 1868, ch. 186, §§ 5, 14, 15 Stat. at 126, 130 (requiring the same). In addition, distillers must permit authorized internal revenue officers to enter and examine their distilled spirits plants at any time, day or night, and take inventory as necessary, 26 U.S.C. § 5203(b), as well as "furnish" to the

3

Secretary "such keys as may be required for internal revenue officers to gain access to the premises," *id.* § 5203(a).

**2.** As relevant here, the panel held that the challenged restrictions exceed Congress's power to take steps necessary and proper to securing the distilled-spirits tax.[2] The panel believed that the restrictions were not "plainly adapted" to tax collection because they "reduce" revenue by preventing some individuals who want to home distill from doing so and paying the tax. Op. 16–18. And although Congress has imposed a number of other requirements on distillers—including the requirement that they register their stills, obtain a distilling permit, and permit inspection of their distilling premises by internal revenue officers at any time, day or night—the panel believed the location restrictions were different in kind because they amounted to a "pure prohibition of conduct that might otherwise have generated taxable products." Op. 18. The panel further believed that the government's theory would permit the prohibition of nearly any at-home conduct where taxable activity could be concealed, such as home-based businesses or remote work. Op. 22.

---

[2] The panel also held that plaintiffs had standing to bring this pre-enforcement challenge. Op. 6–9. The government does not contest this aspect of the panel's opinion.

**3.**  Eleven days later, the Sixth Circuit reached the opposite conclusion in a parallel challenge to the same location restrictions. Writing for the majority, Judge Kethledge explained that the rationale supporting the location restrictions and tax collection is "almost self-evident": stills are more easily hidden in homes (then and today), and as a legal and practical matter, it is much harder for the government to inspect distilling operations located inside a house than inside a bonded premises dedicated to distilling spirits. *Ream v. U.S. Dep't of the Treasury*, No. 25-3259, 2026 WL 1078212, at *4 (6th Cir. Apr. 21, 2026). The Sixth Circuit was likewise unpersuaded that the challenged provisions "reduce" revenue by preventing some would-be distillers from home-distilling and paying the tax. *Id.* at *5. As Judge Kethledge explained, Congress "can take account of causal chains" longer than one person's professed desire to self-report and voluntarily pay taxes. *Id.* Congress could easily conclude, for example, that the location restrictions would have the net effect of increasing revenue by encouraging would-be home distillers to set up their operations in a bonded premise more easily subject to federal inspection and tax collection, or that the challenged restrictions would "shift[] consumption" from untaxed spirits to taxed spirits, "thereby increasing revenue." *Id.* Moreover, the historical record demonstrates that

the law's purpose was "actually to collect revenue" and that Congress enacted these provisions in direct response to "a history of tax evasion as old as the Republic itself." *Id.*

Judge Mathis would have affirmed the district court's dismissal for lack of standing and would not have reached the merits. *Id.* at *6.

**REASONS FOR GRANTING THE PETITION**

The panel's decision invalidates a longstanding Act of Congress and directly conflicts with the Sixth Circuit's decision in *Ream*. Rehearing by the full Court is warranted.

**1.** The Constitution grants Congress the power to "lay and collect Taxes." U.S. Const. art. I, § 8, cl. 1. Under the Necessary and Proper Clause, Congress is further empowered to "make all Laws which shall be necessary and proper for carrying into Execution" an enumerated power. *Id.* cl. 18. While the federal government is one of enumerated powers, a "'government[] entrusted with such' powers 'must also be entrusted with ample means for their execution.'" *United States v. Comstock*, 560 U.S. 126, 133–34 (2010) (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 408 (1819)). The Necessary and Proper Clause thus gives Congress "great latitude" to enact provisions that are "plainly adapted" to a legitimate constitutional end.

*National Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 537 (2012) (quoting *McCulloch*, 17 U.S. (4 Wheat.) at 421).

A law is necessary and proper if it is "convenient" or "useful" for carrying an enumerated power into execution, and a court asks only whether the "means [chosen] . . . [are] rationally related to the implementation" of an enumerated power. *Comstock*, 560 U.S. at 133–34. In the context of Congress's authority over the "manufacture" of taxed goods, the Supreme Court has stated that Congress "may prescribe any rule or regulation which is not in itself unreasonable." *Felsenheld v. United States*, 186 U.S. 126, 132 (1902).

**2.** Congress has long imposed an excise tax on distilled spirits, which, as discussed above, is measured by the spirit's volume and "proof" and attaches "as soon as [the spirit] is in existence." *See* 26 U.S.C. §§ 5001(a)(1), (b), 5002(a)(10)–(11). Regulating the location of distilled spirits plants promotes collection of that tax by facilitating the government's efforts to inspect distilling operations and prevent efforts to elude federal taxes on distilled spirits. A distiller can more easily conceal a spirit's strength (and avoid the proper tax rate), or conceal a distilling operation altogether, if a still is located in a dwelling-house or attached structure. As the Sixth Circuit observed, the

relationship between the location restrictions and tax collection is "almost self-evident:  stills are more easily hidden in homes than in bonded premises dedicated to distilling spirits; and—as both a legal and practical matter—'dwelling houses' are much harder to search at 'all times, as well by night as by day,' than bonded premises are." *Ream*, 2026 WL 1078212, at \*4 (citing 26 U.S.C. § 5203(b)).  Indeed, the law's "purpose is actually to collect revenue," and it was passed precisely to curb "rampant" evasion of the distilled-spirits tax, *id.* at \*4, \*5, after the Select Committee on Internal Revenue Frauds concluded that "seven-eighths of the entire amount of spirits manufactured under the [former] law ha[d] escaped taxation," H.R. Rep. No. 39-24, at 1 (1867).  The Supreme Court itself found it "clear" that the statutory provisions governing distilled spirits "were adopted with one purpose only, namely, to secure the payment of the tax imposed by law upon distilled spirits." *United States v. Ulrici*, 111 U.S. 38, 40 (1884).

It is therefore unsurprising that when Congress first enacted the challenged provisions, it repeatedly linked the "location" of a still to tax collection.  *See* Act of July 20, 1868, ch. 186, §§ 6, 9, 15 Stat. 125, 126–29; *see also id.* § 12, 15 Stat. at 130; Cong. Globe, 39th Cong., 1st Sess. 2839, 2841 (1866).  This concern is reflected today in the structure of 26 U.S.C. § 5178,

which repeatedly emphasizes the relationship between the location restrictions and the need to safeguard tax revenue. Starting with § 5178(a)(1)(B)—the location restrictions themselves—the provision expressly ties regulation of the "premises" of a distilled spirits plant to "revenue" by cross-referencing § 5178(b), which permits the Secretary to take certain steps provided that such actions do not "jeopardize the revenue." 26 U.S.C. § 5178(b). Moreover, the two subparagraphs that bookend § 5178(a)(1)(B) reinforce this conclusion by tethering regulation of a distilled spirits plant's "location" to "afford[ing] adequate security to the revenue." *See id.* § 5178(a)(1)(A) (linking the "location, construction, arrangement, and protection" of distilled spirits plants to "afford[ing] adequate security to the revenue"); *id.* § 5178(a)(1)(C) (same as to the "location, construction, arrangement, and method of operation" of distilled spirits plants). The panel opinion disregards the textual link—plain in the statute itself—between the location restrictions and tax revenue.

3. The panel instead believed that the location restrictions "reduce" revenue by preventing some individuals (like plaintiffs) who want to distill from doing so and paying the tax. Op. 17–18. But Congress is not required to assume voluntary payment and self-reporting when crafting legislation. And

9

the mere fact that plaintiffs insist *they* would pay all applicable taxes does not render unreasonable Congress's determination—grounded in empirics—that many people would not. *See Ream*, 2026 WL 1078212, at *5. Nor is Congress required to take such a narrow view of cause-and-effect when determining the appropriate means to address tax evasion. Congress could reasonably conclude, for example, that the location restrictions would motivate at least some would-be home distillers to set up their distilleries in bonded premises more easily subject to federal inspection and tax collection. Relatedly, as the Sixth Circuit reasoned, Congress could "easily" conclude that the location restrictions would have the net effect of raising revenue by "shift[ing] consumption" from untaxed spirits produced in the home to taxed spirits produced in bonded distilleries. *Id.*

The panel opinion also fails to accord appropriate weight to the historical record supporting this nearly 160-year-old law. The notion that the location restrictions "ha[ve] been *ultra vires* all along" because they prevent some people from distilling and paying the tax ignores reality: Congress passed this "monumental effort, running some 109 sections," precisely because distillers were not (and, presumably, still are not) quite so forthcoming. *Ream*, 2026 WL 1078212, at *4, *5. As the Sixth Circuit explained, the location restrictions

10

were enacted without controversy "to bring these 'stupendous frauds'" on federal tax-collection efforts "to an end." *Id.* at \*4 (quoting H.R. Rep. No. 39-24, at 1). And as one month of congressional testimony supports, that legislative decision rested on an "empirical" determination that the location restrictions were, in fact, "necessary" to "collect federal excise taxes on spirits" in light of the well-documented difficulty in getting distillers, including home distillers, to pay. *Id.* at \*5; *see id.* at \*4 (describing testimony from then-Representative and future-President James Garfield regarding widespread concealment of stills by distillers trying to evade their tax obligations).

That the location restrictions make it easier for the government to inspect distilling operations and collect the appropriate tax is just as true today as it was at the time of the law's enactment. Nothing has fundamentally changed about the practical difficulties involved in inspecting distilling operations located inside a dwelling-house or other prohibited location. Nor has anything changed about the federal government's longstanding interest in collecting this substantial source of revenue, which generated over $6.7 billion in the last fiscal year alone. Alcohol & Tobacco Tax & Trade Bureau, *Statistical Release, Tax Collections* (FY2025), https://perma.cc/8DHE-UGQT. Moreover, the "diversion" of taxable products, including distilled

11

spirits, "into domestic commerce without the payment of taxes" continues to be a problem that "threatens Federal revenues." Alcohol & Tobacco Tax & Trade Bureau, *Annual Financial Report, Fiscal Year 2025*, at 2, https://perma.cc/8HFN-ESP5. That Congress legislated on the understanding that some distillers were evading their taxes is therefore no surprise, given the longstanding Founding-era history of "evading excise taxes on liquor" and the commonsense point that "as to liquor and taxes alike," "human nature [has] remain[ed] decidedly unchanged." *Ream*, 2026 WL 1078212, at *1, *5.

The panel also distinguished the location restrictions from the other requirements governing distillers on the ground that the other provisions "allow spirits to be created," while the location restrictions are a "pure prohibition of conduct." Op. 18; *see id.* (discussing the licensing requirement); *see, e.g.*, 27 U.S.C. §§ 203–204. But there is no meaningful difference between the location restrictions challenged here and, for example, the requirements to obtain a license and to take specific steps to secure distilling systems. Someone who refuses to obtain a license, or who insists on using an unsecured distilling system, is just as prohibited from distilling as someone who insists on distilling in a prohibited location—and indeed, any regulation of taxable

conduct can be categorized as a revenue-decreasing "prohibition" if focused narrowly on a challenger who chooses not to comply. The panel therefore erred in believing that the location restrictions are somehow different in kind from any other regulation governing the manner in which an individual who chooses to undertake a taxable activity goes about doing so.

The panel also appeared to endorse the district court's view that the challenged provisions are invalid because they restrict conduct that takes place before the tax attaches. *See* Op. 17 (citing *Hobby Distillers Ass'n v. Alcohol & Tobacco Tax & Trade Bureau*, 740 F. Supp. 3d. 509, 529 (N.D. Tex. 2024)). The logical result of that theory, however, would be that Congress could not regulate any conduct that occurs temporally before the tax attaches, regardless of the closeness of the relationship between the regulation and tax revenue. That conclusion is at odds with the panel's recognition that Congress can validly impose licensing and other requirements on distillers that similarly regulate conduct before the spirits are created and the tax attaches. *See* Op. 18; 26 U.S.C. § 5171(d)(1); 27 U.S.C. §§ 203–204. And it is incompatible with the longstanding notion that the Constitution leaves the "choice of means" primarily to Congress, and "[i]f it can be seen that the means adopted are really calculated to attain the end," then "the degree of their necessity, the

13

extent to which they conduce to the end, the closeness of the relationship between the means adopted and the end to be attained, are matters for congressional determination alone." *Comstock*, 560 U.S. at 135. Congress's decision to limit activities linked to the widespread evasion of the distilled-spirits tax is plainly related to promoting effective and accurate tax collection—and under governing precedent, that is all that is required to pass constitutional muster.

The panel further believed that the government's theory would permit the prohibition of nearly any at-home conduct where taxable activity could be concealed, such as home-based businesses or remote work. Op. 17. But as Judge Kethledge explained, those speculative theories "would strip away nearly all the particular facts on which the judgment here is based." *Ream*, 2026 WL 1078212, at *6; *see id.* (rejecting the argument that Congress could impose an excise tax on bread-baking or clothes-making and then prohibit those activities "on the theory that home-sewers or home-bakers are less likely to pay the tax'"). Congress's decision here rested on an "empirical judgment": that restricting taxable conduct from areas known to be associated with evasion would effectuate the collection of the distilled-spirits tax. *Id.* at *5. That much is plain from the text of the location restrictions themselves. *See*

26 U.S.C. § 5178(a)(1)(B), (b) (linking the location of distilling operations to averting "jeopard[y]" to the revenue); *see also* §§ 5178(a)(1)(A), (C). Thus, far from being a "pretext" for the "accomplishment of objects not entrusted to the federal government," the location restrictions are "plainly adapted" to Congress's taxing authority, as supported by the specific history of tax evasion to which Congress was responding. *Jinks v. Richland Cnty.*, 538 U.S. 456, 464 (2003) (quoting *McCulloch*, 17 U.S. (4 Wheat.) at 423) (alterations omitted).

Moreover, the fear that this law could open the door to sweeping bans on home activity is undermined by the fact that Congress has done nothing of the sort in the nearly 160 years since this law was enacted. As the Sixth Circuit observed, "to conclude that a law of 160 years' vintage, with this kind of empirical pedigree, has all along been both unnecessary and improper, would border on rationalist conceit." *Ream*, 2026 WL 1078212, at *6.

\* \* \*

In sum, the question presented by the petition plainly satisfies the criteria for en banc rehearing. *See* Fed. R. App. P. 40(b)(2)(C). The panel decision strikes down a longstanding Act of Congress, in conflict with a decision from the Sixth Circuit. Rehearing by the full Court is warranted.

**CONCLUSION**

The Court should rehear this case en banc.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

RYAN RAYBOULD
*United States Attorney*

AUGUST E. FLENTJE
*/s/ Caroline Tan*

CAROLINE W. TAN
*Attorneys, Appellate Staff*
*Civil Division, Room 7236*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-4171*

MAY 2026

**CERTIFICATE OF COMPLIANCE**

The foregoing complies with the type-volume limit of Federal Rule of Appellate Procedure 35(b)(2)(A), because it contains 3,710 words. It also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5)–(6), because it was prepared using Microsoft Word in CenturyExpd BT 14-point font, a proportionally spaced typeface.

/s/ *Caroline Tan*
Caroline W. Tan

**CERTIFICATE OF SERVICE**

I hereby certify that on May 22, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.

                                    _s/ Caroline Tan_
                                    Caroline W. Tan

# PANEL OPINION

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 10, 2026

Lyle W. Cayce
Clerk

———————

No. 24-10760

———————

Scott McNutt,

*Plaintiff—Appellee*,

Rick Morris; Hobby Distillers Association; Thomas O. Cowdrey, III; John Prince, III,

*Plaintiffs—Appellees/Cross-Appellants*,

*versus*

US Department of Justice; Alcohol and Tobacco Tax and Trade Bureau, *a bureau of the U.S. Department of the Treasury*,

*Defendants—Appellants/Cross-Appellees*.

———————————————————————

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:23-CV-1221

———————————————————————

Before Jones and Graves, *Circuit Judges*, and Rodriguez, *District Judge*.[*]

Edith Hollan Jones, *Circuit Judge*:

———————————————

[*] District Judge for the Southern District of Texas, sitting by designation.

No. 24-10760

For more than 150 years, Congress has prohibited home distilleries as an adjunct to the law establishing a federal excise tax on distilled spirits. *See* Act of July 20, 1868, ch. 186, §§ 1–109, 15 Stat. 125, 125–168 (imposing excise taxes on distilled spirits and tobacco). In December 2023, a non-profit organization and several of its members challenged the law as unconstitutional.[1] The district court agreed with them. We concur that, while venerable, the statute violates the Constitution's Taxation and Necessary and Proper clauses. U.S. CONST. art. I, § 8, cls. 1, 18. The district court's judgment and injunction are AFFIRMED in part and REVERSED in part.

## I. BACKGROUND

Plaintiff Rick Morris is a connoisseur of bourbon whisky and a certified bourbon steward, certified because he mastered the art of tasting spirits and learned the science behind distilling and aging alcoholic spirits.

Morris wants to distill bourbon at home, where he has ample space in the backyard and side yard to engage in distilling "a safe distance from [his] house and other houses." As the owner and operator of a company that manufactures stills for the legally approved distillation and re-distillation of alcohol, he could easily undertake this venture. He would distill at home to experiment with bourbon recipes and try them out on his brother and friends.

Pursuing this passion, Morris founded the Hobby Distillers Association ("HDA"), a membership organization that "encourage[s] the legalization of at-home hobby distilling." The HDA claimed more than

---

[1] About a month later, a different plaintiff filed a separate lawsuit in Ohio, challenging the exact statute at issue here. Complaint, *Ream v. DOT*, No. 2:24-CV-364 (S.D. Ohio Jan. 30, 2024), Dkt. No. 1. That case is currently pending before the Sixth Circuit. Notice of Appeal, *Ream v. DOT*, No. 25-3259, (6th Cir. Apr. 8, 2025), Dkt. No. 1.

2

1,300 members as of 2023, many of whom have donated time and money "to advance the cause of legalizing at-home distilling."

Plaintiff Scott McNutt is among the HDA's members who have expressed a desire to distill at home "for beverage purposes." Although he currently distills alcohol pursuant to a fuel-producer permit in a shed 261 feet away from his house, he wants to "tinker around" and create tastier distilled spirits that could potentially inspire a future business.

Plaintiff John Prince III also wants to distill spirits at home as a hobby. For years, he has (legally) produced homemade beer, wine, and other beverages, like hard cider, applejack, and sour-mash whiskey. To branch out into at-home distilling, he would only need to obtain a new condenser or a new still that could be set up in the garage attached to his house.

Likewise, Plaintiff Thomas O. Cowdrey III wants to distill alcohol at home as a hobby. Cowdrey learned about distilling through his friendship with Morris and through the Internet. He previously distilled alcohol for fuel in the garage near his house, but he wants to start at-home distilling to experiment with an apple-pie-vodka recipe he created.

But no one can legally distill consumable spirits at home. In 1868, a bill was enacted that generally imposed excise taxes on distilled spirits and tobacco. *See* Act of July 20, 1868, ch. 186, §§ 1–109, 15 Stat. 125, 125–168. Section 12 of the act did more than impose taxes; it prevented a person from using "any still, boiler, or other vessel for purpose of distilling" when the still was located, among other places, "in any dwelling-house" or "in any shed, yard, or enclosure connected with any dwelling-house." § 12, 15 Stat. at 130. Any violator could be fined and imprisoned. *Id.*

The law has been recodified but continues to provide that:

No distilled spirits plant for the production of distilled spirits shall be located in any dwelling house, in any shed, yard, or

3

> [e]nclosure connected with any dwelling house, or on board any vessel or boat, or on premises where beer or wine is made or produced, or liquors of any description are retailed, or on premises where any other business is carried on (except when authorized under subsection (b)).

26 U.S.C. § 5178(a)(1)(B). Any person who violates the law is subject to a fine of up to $10,000, up to 5 years imprisonment, or both. *Id.* § 5601(a)(6). In recent years, to administer and enforce the at-home distilling ban, some law-enforcement functions were moved from the Bureau of Alcohol, Tobacco and Firearms ("ATF") over to the U.S. Department of Justice ("DOJ") and to the newly created Alcohol and Tobacco Tax and Trade Bureau ("TTB") under the U.S. Department of the Treasury. *See* The Homeland Security Act of 2002, Pub. L. No. 107-296, § 111, 116 Stat. 2274, 2274–75 (2002).

McNutt is no stranger to the TTB. In fact, the TTB apparently believed that McNutt "may have purchased a still capable of producing alcohol and/or equipment and materials that may be used in the manufacture of a still." In 2014, the TTB sent him a "Notice of Potential Civil and Criminal Liability." McNutt was warned that "[f]ederal law provides no exemptions for the production of distilled spirits for personal or family use" at locations other than an authorized distilled-spirits plant. He was further advised that "[u]nlawful production of distilled spirits is a criminal offense, punishable by a fine of up to $500,000 [*sic*] and/or imprisonment for not more than 5 years." The TTB's letter attached a document reporting how it partners with state authorities in "targeting illegal possession of stills and illegal production of distilled spirits."

To question the home distilling ban and this kind of notice, Morris, McNutt, Prince, and Cowdrey had their lawyer telephone the TTB in November 2023 to ask whether they could acquire permits for home

distillation. The TTB said no. According to the TTB representative, the agency would not even consider a request for a permit to distill at home or in a residence because it is "against the law" and "illegal to distill spirits at a residence." Although the TTB might consider issuing a distillery permit solely for fuel alcohol, the agency would not consider issuing a distilled spirits permit for personal consumption.

Shortly afterward, the individual plaintiffs and HDA sued the TTB and DOJ (collectively, "the government"), seeking injunctive and declaratory relief. Their petition asserted that the prohibition and associated criminal provision violate the Constitution's Commerce, Taxation, and Necessary and Proper clauses.

After they moved for a preliminary injunction, the district court advanced the motion to a trial on the merits under FED. R. CIV. P. 65(a)(2). Authoring a very thoughtful opinion, the district court dismissed Morris, Prince, and Cowdrey for lack of standing, but it granted relief to McNutt and HDA upon concluding that the relevant statutes, 26 U.S.C. §§ 5178(a)(1)(B) and 5601(6), violate all three constitutional provisions. The court entered final judgment the day after its order.

The government has appealed, and Morris, Prince, and Cowdrey cross-appealed their dismissal for lack of standing.

## II. Standard of Review

"This court reviews questions of subject-matter jurisdiction de novo." *Jones v. Reeves*, 121 F.4th 531, 534 (5th Cir. 2024) (italics omitted). The court also reviews "the grant of summary judgment de novo, the permanent injunction for abuse of discretion, and the legal issues underlying the grant of the injunction de novo." *Med-Cert Home Care, LLC v. Becerra*, 19 F.4th 828, 830 (5th Cir. 2021) (italics omitted).

## III. Analysis

We address in turn the issues of Article III standing and the statutes' constitutionality.

### A. Standing

A plaintiff satisfies the "irreducible constitutional minimum" for Article III standing by proving (1) an "injury in fact"; (2) a "causal connection between the injury and the conduct complained of"; and (3) a likelihood that a "favorable decision" will redress any injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 112 S. Ct. 2130, 2316 (1992). Because the TTB and DOJ challenge only the injury in fact prong on appeal, our analysis is confined to that element. Further, "standing is not dispensed in gross." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431, 141 S. Ct. 2190, 2208 (2021). HDA's claim of injury is addressed separately.

A plaintiff asserting an Article III injury "must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560, 112 S. Ct. at 2316). A plaintiff who challenges a statute "must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S. Ct. 2301, 2308 (1979) (citing *O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S. Ct. 669, 675 (1974)). But "an actual arrest, prosecution, or other enforcement action" is not required. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, 134 S. Ct. 2334, 2342 (2014). Instead, an official threat may satisfy the injury-in-fact element when (1) the plaintiff has "an intention to engage in a course of conduct arguably affected with a constitutional interest"; (2) that conduct is "proscribed by a

statute"; and (3) "a credible threat of prosecution" exists. *Id.* at 159, 134 S. Ct. at 2342 (quoting *Babbitt*, 442 U.S. at 298, 99 S. Ct. at 2309).

Each of the individuals here has satisfied these elements. First, each seriously intends to distill alcohol at or near his house or in his yard. They all declared under penalty of perjury that they would distill at home if they could. Their stated intentions are more than wishful thinking. Morris could easily start at-home distilling as the owner and operator of a company that manufactures stills for the distillation and re-distillation of fuel alcohol. McNutt has already been legally distilling fuel alcohol in a shed 261 feet away from his home, and the process for making distilled spirits is virtually the same. Prince only needs a new condenser or a new still to start distilling at home because he has already produced homemade beer, wine, and other beverages. And Cowdrey previously distilled alcohol for fuel purposes in the garage near his house and recently created an apple-pie-vodka recipe to distill at home.

Second, the individuals' serious intention to distill alcohol at home for beverage purposes is "proscribed by a statute." *Susan B. Anthony List*, 573 U.S. at 158, 134 S. Ct. at 2342. Because each individual intends to distill at a prohibited location, in or near their houses or on their property, they have shown an "intention to engage in a course of conduct *arguably* . . . proscribed by a statute."[2] *Susan B. Anthony List*, 573 U.S. at 158, 134 S. Ct. at 2342

---

[2] The government contends that this requirement is not met because the statute only prohibits distillation *in* the home rather than *at* home, and McNutt's declaration, for example, does not reference *in-home* distillation. This argument is inaccurate. Although the statute prohibits distillation "in any dwelling house," it also prohibits distillation in any "yard" or "shed." 26 U.S.C. § 5178(a)(1)(B). The term "yard" includes the "[i]nclo[s]ed ground adjoining to an hou[s]e." 2 S. Johnson, A Dictionary of the English Language (6th ed. 1785); 2 N. Webster, A Dictionary of the English Language (1828) ("An inclosure; usually, a small inclosed place in front of

(emphasis added).  Indeed, the Supreme Court has assured that "[n]othing in this Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law." *Id.* at 163, 134 S. Ct. at 2345 (citing *Babbitt*, 442 U.S. at 301, 99 S. Ct. at 2310).

Finally, each individual faces a credible threat of prosecution.  Shortly before filing this suit, a TTB employee informed the individuals' attorney that they could not acquire permits to distill at home because home distilling of consumable spirits is "against the law" and "illegal."[3]  Apart from this conversation, the TTB has a history of enforcing this prohibition, as evidenced by the pointed warning letter McNutt received in 2014 when the TTB apparently found out that McNutt "may have purchased a still capable of producing alcohol and/or equipment and materials that may be used in the manufacture of a still."  The letter and the conversation with the TTB indicate that all four plaintiffs face a credible threat of prosecution and the "realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt*, 442 U.S. at 298, 99 S. Ct. at 2308.  Given the "history of past enforcement," the individuals have provided "good evidence that the threat of enforcement is not 'chimerical.'" *Susan B. Anthony List*, 573 U.S. at 164, 134 S. Ct. at 2345 (some internal quotations omitted) (quoting *Steffel v. Thompson*, 415 U.S. 452, 459, 94 S. Ct. 1209,

---

or around a house or barn.").  The government's distinction between *in* home and *at* home contradicts the statute's plain text.

[3] Unsurprisingly, both the TTB's website and federal regulations confirm this stance. *See Home Distilling*, ALCOHOL AND TOBACCO TAX AND TRADE BUREAU, https://www.ttb.gov/distilled-spirits/penalties-for-illegal-distilling (last visited Dec. 5, 2025) (noting that "[f]ederal law strictly prohibits individuals from producing distilled spirits at home" and that "[p]roducing distilled spirits at any place other than a TTB-qualified distilled spirits plant can expose [the individual] to Federal charges for serious offenses"); 29 C.F.R. § 19.51 ("A person may not produce distilled spirits at home for personal use.").

1215–16 (1974)).  The credible threat here clearly falls within this court's recent precedent.  *See, e.g.*, *Texas v. Yellen*, 105 F.4th 755, 765 (5th Cir. 2024) (recognizing a substantial threat of enforcement when the pertinent statutory requirement was mandatory and demonstrated that the plaintiffs had "an actual and well-founded fear that the law will be enforced against them" (citations omitted)).  The individually named plaintiffs have standing to sue.

Separately, as an organization, the HDA can satisfy associational standing by proving three elements: (1) its members would "have standing to sue in their own right"; (2) HDA is trying to protect interests that "are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343, 97 S. Ct. 2434, 2441 (1977).  Here, the individual plaintiffs are members of HDA and have standing to sue in their own right.  HDA seeks to protect interests that are relevant to its organizational purpose—namely, "encourag[ing] the legalization of at-home hobby distilling" and "advanc[ing] the cause of legalizing at-home distilling."  Finally, neither HDA's constitutional claims nor its request for injunctive relief require individualized proof, rendering the participation of the HDA's members unnecessary.  The HDA has associational standing.

## B. 26 U.S.C. Section 5178(a)(1)(B)[4]

The government defends the statutory prohibition on at-home distillation of spirits as a "necessary and proper" exercise of Congress's power to "tax."[5]  We disagree.  First, contrary to the government's

---

[4] 26 U.S.C. § 5601(a)(6) enforces the statutory ban by creating criminal penalties. For convenience, the statutes are both signified by the prohibitory provision alone.

[5] The government does not challenge the district court's Commerce Clause analysis on appeal.  Accordingly, any such argument is forfeited, and we do not address it.

assumption, Section 5178 and Section 5601 are outside the scope of Congress's taxing power under the Constitution.  Second, contrary to federalism principles, the statutory prohibition is not plainly adapted to executing Congress's taxing power and violates the Necessary and Proper Clause.

### 1. The Taxation Clause

Among Congress's enumerated powers is its authority to "lay and collect Taxes . . . to pay the Debts and provide for the common Defence and general Welfare of the United States."  U.S. CONST. art. I, § 8, cl. 1.  The parties do not dispute that Congress may impose a tax on distilled spirits, which attaches "as soon as [the spirit] is in existence."  26 U.S.C. § 5001(b).  But Section 5178, quoted above, does not mention the tax or the means of its assessment.  Instead, the provision prohibits the activity that would generate taxable spirits and, together with Section 5601, imposes criminal penalties.  We return to fundamental principles to determine whether the taxation power extends to such a prohibition.

During the Founding era, to "lay" meant to "assess; to charge; to impose."  2 N. WEBSTER, A DICTIONARY OF THE ENGLISH LANGUAGE (1828) ("WEBSTER").  It also meant "[t]o charge as a payment."  2 S. JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (6th ed. 1785) ("JOHNSON").  To "collect" meant to "[t]o gather together; to bring into one place," 1 JOHNSON, or to "gather money or revenue from debtors; to demand and receive," 1 WEBSTER.  And a "tax" meant "[a] rate or sum of money assessed on the person or property of a citizen by government, for the use of the nation or state."  2 WEBSTER;

---

*See* FED. R. APP. P. 28(a)(8); *Boone v. Rankin Cnty. Pub. Sch. Dist.*, 140 F.4th 697, 711 (5th Cir. 2025).

*see also* 2 JOHNSON (defining it as "[a]n impost" or "a tribute imposed"). Together, these definitions confirm the obvious: the power to "lay and collect Taxes" means Congress can charge or demand money from taxpayers.

It is also obvious that the purpose of a tax is to raise revenue for the government.[6] Indeed, "the *essential* feature of any tax" is that "[i]t produces at least some revenue for the Government." *NFIB v. Sebelius*, 567 U.S. 519, 564, 132 S. Ct. 2566, 2594 (2012) (emphasis added); *see also United States v. Butler*, 297 U.S. 1, 61, 56 S. Ct. 312, 317 (1936) ("A tax, in the general understanding of the term, and as used in the Constitution, signifies an exaction *for the support of the government*." (emphasis added)); 2 WEBSTER (defining a "tax" as "[a] rate or sum of money assessed on the person or property of a citizen by government, *for the use of the nation or state*." (emphasis added)). And Congress has the power to tax activity that it cannot directly regulate. *See License Tax Cases*, 72 U.S. (5 Wall.) 462, 471 (1867); *NFIB*, 567 U.S. at 537, 132 S. Ct. at 2579; *cf. Foreman v. United States*, 255 F. 621, 623 (4th Cir. 1918) (upholding regulations that affected the revenue, even though their effect was "only remote and incidental" and "tend[ed] to promote public health and morals and doubtless that consideration influenced its enactment").

Moreover, "'[e]very tax is in some measure regulatory.'" *NFIB*, 567 U.S. at 567, 132 S. Ct. at 2596 (quoting *Sonzinsky v. United States*, 300 U.S.

---

[6] *See* 1 THE POLITICAL WRITINGS OF JOHN DICKINSON 179 (1801) ("A '*tax*' mean[t] an imposition to raise money." (emphasis in original)); *id.* at 174 ("To the word '*tax*,' I annex that meaning which the constitution and history of *England* require to be annexed to it; that is—that it is *an imposition on the subject, for the sole purpose of levying money*." (emphasis in original)); 1 JOURNALS OF THE CONTINENTAL CONGRESS 1774–1789, at 84 (Worthington C. Ford ed., 1904) (stating that Britain's taxes and impositions under the Stamp Act were "for the express purpose of raising a [r]evenue").

506, 513, 57 S. Ct. 554, 555 (1937)). But while "a tax is not any the less a tax because it has a regulatory effect," *Sonzinsky*, 300 U.S. at 513, 57 S. Ct. at 555–56, "Congress's ability to use its taxing power to influence conduct is not without limits," *NFIB*, 567 U.S. at 572, 132 S. Ct. at 2599. The Court emphasized in *NFIB* that "the power to tax is not the power to destroy while this Court sits." *Id.* at 573, 132 S. Ct. at 2600 (internal quotations omitted). Consequently, "Congress's authority under the taxing power is limited to requiring an individual to pay money into the Federal Treasury, *no more*." *Id.* at 574, 132 S. Ct. at 2600 (emphasis added). In fact, "[i]f a tax is properly paid, the Government has *no* power to compel or punish individuals subject to it." *Id.* (emphasis added). Or as the Court noted nearly a century ago, "[i]t is not contended that [the taxing] provision grants power to regulate agricultural production on the theory that such legislation would promote the general welfare." *Butler*, 297 U.S. at 64, 56 S. Ct. at 318.

Section 5178(a)(1)(B) and Section 5601(a)(6) exceed these constitutional limits. Primarily, neither provision raises revenue. Not only do they prohibit at-home distilleries, but in so doing, they amount to an anti-revenue provision that prevents distilled spirits from coming into existence. *Cf.* 26 U.S.C. § 5001(b) (taxation begins "as soon as [the spirit] is in existence"). The provisions operate to *reduce* revenue instead of raising it. This violates the Supreme Court's explanation of how the federal power of taxation works: "[I]mposition of a tax nonetheless leaves an individual with *a lawful choice* to do or not do a certain act, so long as he is willing to pay a tax levied on that choice." *NFIB*, 567 U.S. at 574, 132 S. Ct. at 2600 (emphasis added). These plaintiffs have only the choice *not* to do as they wish or risk fines and imprisonment.[7]

_____

[7] This purely regulatory set of options is analogous to the Court's description of Congress's power under the Commerce Clause, which confers broader ability to control

The government contends that this prohibition was enacted to prevent tax evasion because "[a] distiller can more easily conceal a spirit's strength (and thus avoid the proper tax rate)—or conceal a distilling operation altogether—if his still is in his house or connected with it."[8] But just as "Congress cannot authorize a trade or business within a State in order to tax it," it stands to reason that Congress cannot prohibit intrastate activity solely because it might produce products hard to tax.[9] *License Tax Cases*, 72 U.S. (5 Wall.) at 471. Congress's taxing power "reaches only existing subjects," not activity that may generate subjects of taxation. *Id.* Put otherwise, preventing activity lest it give rise to tax evasion places no limit whatsoever on Congress's power under the taxation clause. In contrast, all of the other statutory provisions governing the manufacture, bottling, and labelling of distilled spirits exist to facilitate collection of taxes associated with the activity, not to prevent spirits from being distilled in the first place. Section 5178(a)(1)(B) and Section 5601(a)(6) do not represent an exercise of the taxation power of Congress.

---

individual behavior than does the power of taxation. *See id.* at 572–73, 132 S. Ct. at 2599–600.

[8] *See* H.R. Rep. No. 39-24, at 1 (1867) ("[I]n the manufacture and sale of . . . spirits, . . . the most stupendous frauds are practiced against the government in the collection of its revenue. Indeed, it is believed that at least seven-eighths of the entire amount of spirits manufactured under the present law have escaped taxation.").

[9] The government now contends that "[t]he location restriction does not ban plaintiffs from distilling . . . at home"—it simply limits where *on an individual's property* he may place his still, thus only "regulat[ing] the manner in which the plaintiffs go about that taxable activity." As discussed above, however, the statute not only prohibits distillation "in any dwelling house" but also in any "yard" or "shed." 26 U.S.C. § 5178(a)(1)(B). Contrary to the government, by its terms, the statute prohibits distillation anywhere on one's property.

## 2. The Necessary and Proper Clause

The government's primary defense of the home distilling ban rests on the Necessary and Proper Clause. That clause has been characterized as the "last, best hope of those who defend ultra vires congressional action." *Printz v. United States*, 521 U.S. 898, 923, 117 S. Ct. 2365, 2378–79 (1997). Congress is empowered to "make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const. art. I, § 8, cl. 18. To satisfy the clause, a law must "carry[] into Execution" some other enumerated power. In general, the Necessary and Proper Clause "gives Congress power to pass laws both 'vertically' to implement its own enumerated powers and 'horizontally' to implement the constitutionally vested powers of federal executive and judicial officers." Gary Lawson & Patricia B. Granger, *The "Proper" Scope of Federal Power: A Jurisdictional Interpretation of the Sweeping Clause*, 43 Duke L.J. 267, 274 n.23 (1993).

Chief Justice Roberts stated, "We have long read this provision to give Congress great latitude in exercising its powers." *NFIB*, 567 U.S. at 537, 132 S. Ct. at 2579. He reinforced the need for deference by quoting *McCulloch*'s famous statement: "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421 (1819). Nonetheless, the Necessary and Proper Clause "does not license the exercise of any 'great substantive and independent power[s]' beyond those specifically enumerated." *NFIB*, 567 U.S. at 559, 132 S. Ct. at 2591. And the Court cautioned, "[o]ur respect for Congress's policy judgments thus can never extend so far as to disavow restraints on

14

No. 24-10760

federal power that the Constitution carefully constructed." *Id.* at 537, 132 S. Ct. at 2579.

The Framers insisted that this clause grants no new power to Congress.[10] Moreover, by its own terms, "even where a law is necessary," "it may still be 'improper.'" *Hobby Distillers Ass'n v. Alcohol & Tobacco Tax & Trade Bureau*, 740 F. Supp. 3d 509, 526 (N.D. Tex. 2024). The issue thus becomes whether Section 5178 and Section 5601 are both "necessary" and

---

[10] *See* 2 Debates in the Several State Conventions on the Adoption of the Federal Constitution 468 (Jonathan Elliot ed., 2d ed. 1836) ("Elliot's Debates") (James Wilson stating that the Necessary and Proper Clause "is saying no more than that the powers we have already particularly given, shall be effectually carried into execution," and that it "gives more or other powers; nor does it, in any degree, go beyond the particular enumeration" because Congress's power under this clause "is limited and defined by the following, 'for carrying into execution the foregoing powers'"); 3 Elliot's Debates, at 441 (Edmund Pendleton stating that the Necessary and Proper Clause does "not go[] a single step beyond the delegated powers," and if Congress wanted to pass a law under this clause, "they must pursue some of the delegated powers, but can by no means depart from them, or arrogate any new powers; for the plain language of the clause is, to give them power to pass laws in order to give effect to the delegated powers"); 3 Elliot's Debates, at 455 (James Madison explaining that the clause "only extended to the enumerated powers," and "[s]hould Congress attempt to extend it to any power not enumerated, it would not be warranted by the clause" because "it was a restraint on the exercise of a power expressly delegated to Congress"); 4 Elliot's Debates, at 141 (Archibald Maclaine stating that "Congress can have no power but what we expressly give them"; that the Necessary and Proper Clause "gives no new power, but declares that those already given are to be executed by proper laws"; and that Congress "can make no laws to execute any other power" because the clause "specifies that they shall make laws to carry into execution *all the powers vested* by this Constitution" (emphasis in original)); 1 Annals of Cong. 277 (Joseph Gales ed., 1789) (Elbridge Gerry stating that the clause "gives no legislative authority to Congress to carry into effect any power not expressly vested by the constitution"); 3 Joseph Story, Commentaries on the Constitution 267 (1833) (the clause "neither enlarges any power specifically granted; nor is it a grant of any new power to congress" but "is merely a declaration for the removal of all uncertainty, that the means of carrying into execution those, otherwise granted, are included in the grant").

"proper" in relation to the assessment and collection of federal taxes on distilled spirits.

### a. Necessary

Dictionaries published at the time of the Founding defined "necessary" to mean "indispensably requisite;" "indispensable; requisite, essential;" or "[u]navoidable." 2 WEBSTER; *see also* 2 JOHNSON (defining "necessary" as "[n]eedful" or "indispensably requisite"). Early in our history, however, defining "necessary" to encompass "indispensable" arguably revealed some tension in the text of the Constitution. Several clauses use the word "necessary" in slightly different senses.[11] In *McCulloch*, Chief Justice Marshall recognized that "necessary" was defined as "indisputably requisite," but he resolved the incongruities in the constitutional text by holding that "necessary" does not always mean "indispensable" and may instead connote "one thing [that] is convenient, or useful, or essential to another." 17 U.S. (4 Wheat.) at 367, 413–14. The Court concluded that to be "necessary," a law must be "plainly adapted" to an enumerated power. *Id.* at 421. This description has prevailed since then. *See NFIB,* 567 U.S. at 537, 132 S. Ct. at 2579 (quoting *McCulloch*, 17 U.S. (4 Wheat.) at 421); *Jinks v. Richland County*, 538 U.S. 456, 462, 464, 23 S. Ct. 1667, 1671 (2003) (recognizing the "plainly adapted" standard as the proper test); *United States v. Comstock*, 560 U.S. 126, 134, 130 S. Ct. 1949, 1956 (2010) (same); *James Everard's Breweries v. Day*, 265 U.S. 545, 558–59, 44 S. Ct. 628, 631 (1924)("[i]t has long been settled that Congress . . . may adopt any means, appearing to it most eligible and appropriate, which are

---

[11] *Compare* U.S. CONST. art. I, § 10, cl. 2 (states limited to imposing duties "absolutely necessary" for inspection laws), and art. II, § 3 (President's State of the Union message to contain "necessary and expedient" information), *with* art. I, § 8, cl. 18 (the Necessary and Proper Clause enabling Congress to effectuate enumerated powers).

*adapted* to the end to be accomplished and consistent with the letter and spirit of the Constitution" (emphasis added)).

Judged by the *McCulloch* standard,[12] prohibiting at-home distilleries is not "plainly adapted" to effectuate Congress's taxation of spirits. The provisions challenged here do not tax the distilled spirits or the still; they flatly prohibit and penalize distillation inside a home or in any yard or shed connected to a home. *See* 26 U.S.C. §§ 5178(a)(1)(B), 5601(a)(6).[13] Because these provisions tax nothing, and are distinct from the regulation of distilling alcoholic products that is permitted by federal tax law, they do not help Congress raise revenue. On the contrary, the statutes reduce revenue by preventing individuals from making distilled spirits. The district court correctly explained that "the provisions at issue punish individuals Congress cannot reach," *Hobby Distillers Ass'n*, 740 F. Supp. 3d at 529, and this is because it criminalizes the conduct of a person in order to prevent its taxation power from taking effect. Section 5178 has no "real or substantial relation to the enforcement of" the taxing power. *James Everard's Breweries*, 265 U.S. at 560, 44 S. Ct. at 632.

Pointing to the legislative justification for the 1868 enactment of what became Section 5178(b)(1)(A), the government cites then-rampant evasion of the spirits tax and the perceived need to curb abuse by regulating the

---

[12] We do not read *Comstock* as modifying *McCulloch* to import some kind of rational basis test into the Necessary and Proper Clause. Instead, the Court's discussion about the "necessity" of providing long-term confinement for certain incurable prisoners demonstrated a clear chain of causation from Congress's power, derived from its enumerated powers, to prescribe crimes and imprisonment. As noted, *Comstock* expressly relied on the *McCulloch* formulation. *See* 560 U.S. at 134, 130 S. Ct. at 1956. In any event, *NFIB*'s description of the Necessary and Proper Clause in relation to the taxing power is directly on point in this case.

[13] In fact, a separate provision criminalizes the mere possession by individuals of distillation equipment for use at their homes. *See* 26 U.S.C. § 5601(a).

location of distilleries.[14]    Accordingly, separate paragraphs within Section 5178 as a whole authorize the Treasury Secretary to license distilleries and prohibit their location, without express approval, where any other business is carried on.  *See* 26 U.S.C. § 5178(a)(1)(A), (C), (b).  Together with these provisions, an "elaborate system has been set up by legislation and regulations thereunder to protect the revenue on distilled spirits."  *United States v. Goldberg*, 225 F.2d 180, 187 (8th Cir. 1955).  But instead of demonstrating how the at-home distillery prohibition is "plainly adapted" to protect the federal revenue stream, the regulations repudiate the government's position.

First, licensing and regulating distilleries accomplish the purposes of taxation because they allow spirits to be created.  The regulations authorize a person to conduct distilling so long as he is willing to pay a tax.  *Cf. NFIB*, 567 U.S. at 574 132 S. Ct. at 2600 ("imposition of a tax nonetheless leaves an individual with a lawful choice to do or not do a certain act, so long as he is willing to pay a tax levied on that choice").  Section 5178, in contrast to regulating the creation and distribution of distilled spirits, is a pure prohibition of conduct that might otherwise have generated taxable products.

Second, licensing at-home distilling would subject the plaintiffs, or any individuals, to the same regulatory regime that covers licensed distillers.[15]  Thus, plaintiffs' failures to obtain a license or comply with the

––––––––––––––––––––––

[14] *See* H.R. Rep. No. 39-24, at 1 (1867) ("[I]n the manufacture and sale of . . . spirits, . . . the most stupendous frauds are practiced against the government in the collection of its revenue.").

[15] Indeed, the TTB might resurrect a proposal that Congress considered before it adopted the ban on at-home distilling: tax "the capacity of the distillery," a "simple, easy, and effective" method that would "greatly . . . reduce the expense of collection" and "avoid all the various temptations and opportunities for fraud."  *See* H.R. Rep. No. 39-24, at 5 (1867).

regulations or pay the spirits tax would be sanctionable, just as such noncompliance or evasion by currently licensed distillers is punishable. Excising the Section 5178 prohibition and the accompanying Section 5601 penalty would place at-home distilleries on the same level as current licensees. And it goes without saying that the economics and practicality of at-home distilling today are much different than they were in the nineteenth century, and so is the government's ability to investigate such activity. In sum, the challenged provisions do nothing to further tax collection; they only inhibit revenue raising.

Significantly, the Supreme Court long ago rejected Congress's attempt to ban one product in order to further taxation of another product. *See United States v. Dewitt*, 76 U.S. (9 Wall.) 41 (1869). There, the challenged statute prohibited the sale of naphtha mixed with illuminating oils. *Id.* at 44. The government attempted unsuccessfully to defend the statute's constitutionality under the Commerce Clause and taxing power. As to the latter, it argued, the prohibition "was in aid and support of the internal revenue tax imposed on other illuminating oils." *Id.* The Court rejected the government's justifications as "too remote and too uncertain" to conclude that "the prohibition [wa]s an appropriate and plainly adapted" execution of the taxing power. *Id.* Further, "[i]f the prohibition . . . has any relation to taxation at all, it is merely that of increasing the production and sale of other oils, and, consequently, the revenue derived from them, by excluding from the market the particular kind described." *Id.* While the government proposed analogies to various distilled-spirits regulations, the Court noted that those regulations were "restricted to the very articles which are the subject of taxation," but "in the case before [the Court], *no tax is imposed on the oils . . . .*" *Id.* (emphasis added). Therefore, the Court held that this prohibition was a "police regulation"—reserved to the states—and unconstitutional as a federal measure. *Id.* at 45.

Similarly, the government's citation of cases that are "restricted to the very articles which are the subject of taxation" are inapposite to Section 5178's prohibition of conduct in order to prevent taxable activity. In *Felsenheld v. United States*, the Court upheld a federal law that prohibited inserting coupons or other "prize[s]" in tobacco packages. *See* 186 U.S. 126, 127, 130–35, 22 S. Ct. 740, 741–43 (1902). Congress had not abused its power under the Taxation Clause, the Court concluded, because "for the manufacture and handling of goods which are subjected to an internal revenue tax," "it is a perfectly reasonable requirement that every package of such goods should contain nothing but the article which is taxed . . . ." *Id.* at 132, 22 S. Ct. at 742–43. And in *Stilinovic v. United States*, the court upheld the constitutionality of a law that prohibits sellers of distilled spirits from "plac[ing] in any liquor bottle any distilled spirits whatsoever other than those contained in such bottle at the time of stamping[.]" 336 F.2d 862, 863–65 (8th Cir. 1964) (quoting 26 U.S.C. § 5301(c)); *see also Goldberg*, 225 F.2d at 188 (upholding a similar regulation as "reasonably related to the protection of the revenue"). Such measures facilitate the measurement and integrity of the taxable products and clearly relate to tax collection. These cases thus concern "the very articles" subject to taxation, not those, as in this case, on which "no tax is imposed." *See Dewitt*, 76 U.S. (9 Wall.) at 44.

### b. Proper

Among other definitions in dictionaries of the Founding era, "proper" meant "particularly suited to" or "correct" or "just," 2 WEBSTER, and it represented something that was "[n]atural" or "original" or even "[f]it; accommodated; adapted; suitable; qualified," 2 JOHNSON.

At the Founding, the term "proper" was frequently used when individuals were discussing "the allocation of governmental powers" or the separation of powers. Lawson & Granger, *supra*, at 291; *see also* Randy E.

Barnett, *The Original Meaning of the Necessary and Proper Clause*, 6 U. PA. J. CONST. L. 183, 217 (2003) (stating that a law's propriety may be determined "(1) according to principles of separation of powers, (2) according to principles of federalism, and (3) according to the background rights retained by the people.").

Indeed, writing as Publius, Alexander Hamilton explained that "[t]he propriety of a law, in a constitutional light, must always be determined by the nature of the powers upon which it is founded." THE FEDERALIST NO. 33, at 206 (J. Cooke ed. 1961). Accordingly, when "acts of the larger society . . . are not pursuant to its constitutional powers . . . [and] are invasions of the residuary authorities of the smaller societies," then these actions "will be merely acts of usurpation and will deserve to be treated as such." *Id.* at 207. Consistent with this understanding, *McCulloch* characterized a law as "proper" when it is "not prohibited" by another enumerated powers and is "consist[ent] with the letter and spirit of the constitution." *McCulloch*, 17 U.S. (4 Wheat.) at 421. A law must be declared unconstitutional if Congress "adopt[ed] measures which are prohibited by the constitution" or "pass[ed] laws for the accomplishment of objects not [e]ntrusted to the government" and "under the pretext of executing its powers." *Id.* at 423. Relatedly, a law that exceeded Congress's powers would expand the federal government and necessarily infringe on state sovereignty. *Printz*, 521 U.S. at 923–24, 117 S. Ct. at 2379.[16] By purporting

---

[16] "[T]he Constitution established a system of 'dual sovereignty.'" *Id.* at 918, 117 S. Ct. at 2376 (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 457, 111 S. Ct. 2395, 2399 (1991)). On one hand, it created "a Federal Government of enumerated powers." *United States v. Lopez*, 514 U.S. 549, 552, 115 S. Ct. 1624, 1626 (1995) (citing U.S. CONST. art. I, § 8). But on the other, the state governments' powers are "numerous and indefinite." THE FEDERALIST NO. 45, at 313 (J. Cooke ed.). Because of these principles, Congress lacks "a plenary police power that would authorize enactment of every type of legislation." *Lopez*, 514 U.S. at 566, 115 S. Ct. at 1633.

to ban activity without a plain connection to the exercise of Congress's taxation power, Congress has essentially—and "improperly"—invaded the reserved police and regulatory power of the states.

We agree with Plaintiffs that Sections 5178(a)(1)(B) and 5601(a)(6)'s banning and criminalization of at-home distilling "is not a proper means of exercising the tax power" because it "takes away Plaintiffs' choice to pay the tax" by engaging in otherwise legal, albeit licensed and regulated, activity. Indeed, by "claim[ing] the authority to ban [the imposition of] a tax liability out of fear of future tax avoidance," the government "invites a question: what cannot be banned?" Under the government's logic, Congress may criminalize nearly any at-home conduct only because it has the possibility of concealing taxable activity. Home-based businesses may be forbidden. Remote work may be deemed a crime. But "the taxing power does not give Congress the same degree of control over individual behavior [as the Commerce Clause]." *NFIB*, 567 U.S. at 573, 132 S. Ct. at 2600. Logically, the Necessary and Proper Clause cannot expand the reach of the taxing power to criminalize conduct that could produce taxable revenue under the pretext that generating revenue for the federal government will be enhanced.

Without any limiting principle, the government's theory would violate this court's obligation to read the Constitution "carefully to avoid creating a general federal authority akin to the police power." *Id.* at 536, 132 S. Ct. at 2578. As a result, Sections 5178(a)(1)(B) and 5601(a)(6) are not "proper" within the meaning of the Necessary and Proper Clause.

## IV. Conclusion

The statutory prohibitions on in-home distilling are neither "plainly adapted" to Congress's taxing power nor "consist[ent] with the letter and spirit" of the Constitution. *See McCulloch*, 17 U.S. (4 Wheat.) at 421. The district court correctly determined that these statutes here violate the

No. 24-10760

Taxation and Necessary and Proper clauses. Because we have concluded that all plaintiffs have Article III standing to challenge these provisions, we AFFIRM as MODIFIED the district court's judgment and injunction[17] against their enforcement.

_____

[17] Generally, for a permanent injunction, a plaintiff must establish that (1) he or she suffered an irreparable injury; (2) the remedies available at law are inadequate; (3) the balance of hardships between the plaintiff and defendant warrants a remedy in equity; and (4) a permanent injunction would not disserve the public interest. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391, 126 S. Ct. 1837, 1839 (2006). On appeal, the government makes no arguments on the district court's permanent-injunction analysis of these four factors. Accordingly, any such argument is forfeited. *See* Fed. R. App. P. 28(a)(8); *Boone*, 140 F.4th at 711.